LIVESLEY *v.* CONTINENTAL MOTORS CORPORATION.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—EXPRESS WARRANTY
   —NEGLIGENCE.
      Questions arising from violation of express warranty are not of
         controlling importance in action for damages based on negli-
         gence of defendant in installing in an airplane engine a con-
         necting rod containing a latent defect.

2. EVIDENCE—STEEL—INCLUSION PITS.
      It is undisputed that all steel contains so-called inclusion pits of
         nonmetallic matter, the weakening effect of which depends upon
         the concentration and size of such pits.

3. SAME—PURITY OF STEEL—TEST—MAGNAFLUX.
      Magnaflux, a test used for determining concentration and size of
         inclusion pits of nonmetallic matter in steel used in airplane
         engines, *held,* shown to be the standard and most efficient test to
         determine the presence or absence of such pits.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–10] Generally as to liability of seller for injuries from defect
   in article sold, see 46 Am Jur, Sales § 799 *et seq.*
      Liability of manufacturer or packer of defective article for
   injury to person or property of ultimate consumer who pur-
   chased from middleman.  17 ALR 672; 39 ALR 992; 63 ALR
   340; 88 ALR 527; 105 ALR 1502; 111 ALR 1239; 140 ALR
   191; 142 ALR 1490.
      Liability of seller of article not inherently dangerous for
   personal injuries due to defective or dangerous condition of the
   article.  13 ALR 1183; 74 ALR 347; 168 ALR 1069.
      Liability to third person of seller of article not inherently
   dangerous for injury or death due to dangerous condition of
   article sold.  42 ALR 1243; 60 ALR 371.
      Duty of manufacturer or seller as to warning of latent danger
   incident to articles as a class, as distinguished from duty with
   respect to defect in particular article.  86 ALR 947.
      Manufacturer's liability for negligence causing injury to
   person or damage to property of ultimate consumer or user.  164
   ALR 569.
[3, 5, 6, 9] 46 Am Jur, Sales § 815.
      Manufacturer's liability for injury or damage as affected by
   test, or failure to test, for defects.  156 ALR 479.
[4] 11 Am Jur, Conflict of Laws § 182.
[8] 20 Am Jur, Evidence § 773.

4. CONFLICT OF LAWS—NEGLIGENCE—CONNECTING ROD IN AIRPLANE ENGINE—LATENT DEFECT.

Michigan law controls the question of liability in action for damages based on inclusion in an airplane engine of a connecting rod containing a latent defect, rather than the law of Oregon where damages resulted, in the absence of a precedent in Oregon applying a different rule, where the engine was manufactured in Michigan and tests to discover such latent defect would be applied in this State.

5. NEGLIGENCE—AIRPLANE ENGINE MANUFACTURER—LATENT DEFECT IN CONNECTING ROD—EVIDENCE.

Evidence *held,* insufficient to show defendant was negligent in applying standard tests to discover latent defects in connecting rod included in airplane engine it had manufactured.

6. SAME—AIRPLANE ENGINE MANUFACTURER—EVIDENCE—INSPECTION —STANDARD TESTS.

Defendant engine manufacturer's failure to apply tests which plaintiff claims would have shown up latent defects in connecting rod used in airplane engine would not be evidence of negligence where tests suggested by plaintiff were shown either to be less efficient or sensitive or were not such as experience had proven practicable or standard and defendant did show it had applied tests then required by controlling governmental authority.

7. SAME—PROXIMATE CAUSE—CONNECTING RODS IN AIRPLANE ENGINE —EVIDENCE.

Whether or not the breaking of the connecting rod, as claimed by plaintiff, or the breaking of the stud or stud nut, as claimed by defendant, was the original cause of the breakdown of the airplane engine and ensuing damage to plaintiff, is not considered, where the jury determined in favor of plaintiff, but plaintiff failed to show negligence on the part of defendant respecting the installation of the connecting rod or testing it before or after installing it in the engine.

8. EVIDENCE—OPINION.

Expression of opinion by witness which has no basis on any knowledge of the witness is without evidentiary force.

9. NEGLIGENCE—MANUFACTURER—INSPECTION.

Reasonable care on the part of a manufacturer of an article consists, among other things, in making such inspections and tests during the course of manufacture and after the article is completed as the manufacturer should recognize as reasonably necessary to secure the production of a safe article.

10. SAME—MANUFACTURER—EVIDENCE—QUESTION FOR JURY.
The liability of the manufacturer for negligence in the manu-
facture of an article is not considered when the negligence
counted on in the case is not shown, for plaintiff has no case
to go to the jury.

Appeal from Muskegon; Sanford (Joseph F.), J.
Submitted April 6, 1951. (Docket No. 45, Calendar
No. 44,994.) Decided October 2, 1951.

Case by T. D. Livesley against Continental Motors
Corporation for damages suffered when motor in
plaintiff's airplane failed during flight. Verdict and
judgment for plaintiff. Defendant appeals. Re-
versed and remanded for entry of judgment of no
cause of action.

*Alexis J. Rogoski, John B. Olsen* and *Robert
Bunker Rogoski,* for plaintiff.

*Alexander, Cholette, Buchanan, Perkins & Conklin
(Edward D. Wells,* of counsel), for defendant.

REID, C. J.   This action based on claimed negli-
gence was brought to recover for damages to an
airplane resulting from a crash landing which oc-
curred on April 3, 1948, near Salem, Oregon. Con-
tributory negligence was waived by defendant. From
a judgment on a jury's verdict for plaintiff, defend-
ant appeals.

About 2 months before the crash landing, plain-
tiff bought from Salem Air Service a new 2-seater
Cessna model 140 aircraft, equipped with a 90 h.p.
Continental engine manufactured by defendant.

Plaintiff lives in Salem and used the airplane in
connection with the affairs of 2 corporations which
produce hops in Oregon and British Columbia. At
the time of the accident, the engine had run a total
of about 80 hours flying time.

While plaintiff on April 3, 1948, was flying back from British Columbia, he noticed a slight roughing of the engine when slightly south of Portland, but continued on for Salem. About 20 minutes later, the engine suddenly became very rough, there was a sharp noise, oil sprayed over the windshield and the engine became "frozen;" plaintiff attempted to glide to a farm field, but the plane struck the edge of a ditch and nosed over. Damages to the plane were shown at $2,163.24. Plaintiff paid $656.23 rental of another airplane pending repairs.

Plaintiff's claim is based solely on negligence, respecting a connecting rod installed in the engine, hence our recent decision in *Parsons Company* v. *Hall,* 319 Mich 240 (2 Av 14491), involving only questions arising from violation of express warranty, is not of controlling importance.

Defendant bought the connecting rod in question from Atlas Drop Forge Company of Lansing, Michigan, hereinafter referred to as Atlas. Atlas bought the steel from Bethlehem Steel Company. Defendant incorporated in the engine in question, the connecting rod in question, sold the engine to Cessna Aircraft, and in accordance with the expectation of defendant the engine was to be incorporated into an aircraft. It was in fact incorporated into the aircraft in question which, through intermediate dealers, came into the hands of plaintiff.

While plaintiff charged in the declaration that the connecting rod, a controlling factor in plaintiff's case, was of insufficient strength to withstand the normal and foreseeable stress and strain, yet in the actual presentation of the case plaintiff aimed his proof solely at the question of latent defect in the connecting rod, and defendant's negligence relating to the claimed latent defect.

Plaintiff claims that defendant installed in the engine a connecting rod containing a latent defect and

neglected to take reasonable care to discover the latent defect and failed to warn plaintiff of a latent defect and failed and neglected to make sufficient tests and inspection for the discovery of latent defect, all pertaining to the latent defect in the connecting rod in question. Plaintiff does not allege the defendant manufactured the connecting rod in a negligent manner.

Plaintiff claims that the connecting rod in question, because of the latent defect, broke during flight and that such break was the origin of the breakdown of the engine, causing the engine to "freeze."

Defendant claims that due to improper readjustments of nuts upon a stud or bolt fastening the cylinder to the crankcase deck, undue fatigue was caused to the nuts and bolts and that during the flight a developing fatigue caused the bolt fastening to give way and ultimately caused the entire fastenings of the cylinder to break and that on account of the breaking of the fastenings of the cylinder, the cylinder flew off and that the piston thrashing sidewise on the rapid movement of the connecting rod, pounded on the deck, made a distinct identifiable indentation on the deck, and caused the breaking off of part (piston end) of the connecting rod which was connected with the piston. Defendant therefore claims that the improper adjustment of the bolts or studs which occurred after the airplane had been in actual flights and at a time when defendant was not in control of the airplane in question, was the actual cause of the "freezing" of the engine and therefore of the crash landing.

Plaintiff claims that the defects which caused the breaking of the end of the connecting rod consisted of inclusion pits, so-called, which in this case are claimed by plaintiff to be nonmetallic matter included in the steel.

It is undisputed that all steel contains inclusion pits, the weakening effect of which depends upon the concentration and size of such inclusion pits.

To detect the presence of such matter included in the steel, not apparent at the surface, there is in current use, according to the testimony shown on this trial, a test known as magnaflux, which was employed as a method of inspection followed by Continental Motors in making the parts in question and which method defendant's witness, Virgil Moser, aviation safety agent for Civil Aeronautics Administration, testified was a method which conformed to the standards required by the Civil Aeronautics Administration.

It must be considered that plaintiff because of the testimony he introduced recognized that the test by magnaflux is the standard and most efficient test to determine the presence or absence of inclusions such as plaintiff relies on.

No question was raised that the law of Oregon rather than of Michigan would control the question of liability. No Oregon case was cited to a different rule than what we arrive at. The engine in question was manufactured in Michigan and shipped from Michigan and out of defendant's control; the magnaflux test or want of it was something that occurred in Michigan. The parties submitted their case on the trial and on this appeal, apparently on the proposition that the Michigan law on torts governs liability, if any, of defendant.

The critical question on this appeal is whether plaintiff made a sufficient showing of negligence on the part of defendant in regard to making the magnaflux test or failing to make an X-ray test. Professor O. G. Paasche, a witness produced by the plaintiff, testified as to his qualification as a metallurgist and to his opinion that the connecting rod in question would have performed satisfactorily had the metal

been clean and further, free from inclusions. This witness further on cross-examination testified as follows:

"*Q*. The magnaflux testing is magnetic, is it not?
"*A*. That is correct.
"*Q*. Magnetic principles. Polarization, and so forth?
"*A*. It involves magnetizing the piece and flowing some magnetic particles over the surface, and at any defect these magnetic particles will gather to work around the defect.
"*Q*. You get the 2 poles of the magnet?
"*A*. Yes, wherever there is a defect, you get 2 poles of a magnet.
"*Q*. Would that be likely to show inclusions such as the larger ones shown in the plaintiff's exhibit C?
"*A*. I doubt that it would show inclusions that small. The photomicrograph is 100 diameters and I doubt that it would—the magnaflux would indicate that."

Professor Paasche's opinion on cross-examination in which he doubts that the magnaflux test would indicate the inclusions in question, stands as uncontradicted testimony in the case.

Plaintiff relies for proof of the negligence in question upon the testimony of witness Louis J. Haga, who is engaged in the business of doing general heat-treating, which is a process in "preparing metal" to do certain jobs. Pertaining to his examination of the metal at the place of the break in the connecting rod in question, he testified on direct examination as follows:

"When the part was examined under polarized light under somewhat more modern equipment, it indicated pretty definitely what looked like holes were definitely of a nonmetallic nature and was in the metal itself. In my opinion the spots in the metal were nonmetallic inclusions. I distinguished them

from the bakelite mounting. The reason is under polarized light it was definitely evident that particles were there that were not bakelite. I was not able to identify the particles with exact certainty except that they were definitely nonmetallic. I feel rather sure that those particles were oxide inclusions, and presumably iron oxide. Practically all the larger particles found were located right at or close to the edge, referred to as the fractured edge. I would consider that a defect in the metal. I should qualify that. I suppose it was a defect in the metal but possibly not inherent in the metal itself, possibly from adding something later. The effect of nonmetallic inclusions of almost any sort is where stress is applied externally to the piece, in time with repeated stress you start a break. I would say those are definitely weaker points in the structure of the metal. From the appearance of these little spots, it didn't seem as though the inclusions were inherent in the metal as produced, that is as melted. They were not hangovers from the melting process. The general appearance and shape would indicate they had been hammered in at a later date. Inclusions such as I found here most likely would be found near the surface. That would be because I feel rather surely these things had been added to or were hammered in at some fairly late stage in the manufacture.

"*Q.* Whether or not nonmetallic inclusions, if they are near the surface of the metal, can be discovered by examination?

"*A.* Yes, nonmetallic inclusions, if they are present *in reasonable concentration,* can be discovered by magnaflux examination and X-ray examination also.

"*Q.* Is there any possible test that can be performed?

"*A.* Yes, in reasonable concentration, and the hot etching procedure could be used to locate such inclusions reasonably close to the surface.

"*Q.* Is that similar to the test Professor Paasche spoke of in his testimony?

"*A.* Yes, that is the same." (Italics supplied.)

On cross-examination the same witness testified as follows:

"*Q.* Do you know whereabouts this piece was taken from the connecting rod?

"*A.* Yes.

"*Q.* Why do you say in your opinion you feel the inclusions were near the surface?

"*A.* Because of the location of that little sample in the bakelite. That was located very close to the surface.

"*Q.* How far were the inclusions below the surface?

"*A.* Probably a thirty-second at the most.

"*Q.* How many inclusion pits of any significance did you find when you looked in this microscope?

"*A.* Possibly 6 or 8.

"*Q.* 6 or 8?

"*A.* Yes.

"*Q.* That would be in a space how long?

"*A.* The space covered approximately that same area on that picture.

"*Q.* Less than a quarter of an inch?

"*A.* Yes.

"*Q.* You don't know whether there were any inclusion pits on either side of this quarter inch that you took out?

"*A.* No.

"*Q.* Is it your opinion there were only 6 inclusion pits in that entire surface across there? Is it your opinion—you wouldn't say the magnaflux could pick that up would you?

"*A.* If that small concentration was typical of the whole place, it would be *difficult* to pick it up with magnaflux.

"*Q.* You will have to assume it couldn't have been any more than you picked up here.   That is all you saw, isn't it?

"*A.* Yes, that is right.

"*Q.* As far as you know there is [are] no more inclusion pits through the entire piece of metal than you have seen?

"*A.* That is right."   (Italics supplied.)

It will be noted that discovery of nonmetallic inclusions would be effective if the inclusions are present *in reasonable concentration,* according to Haga's answer on direct examination, and that on cross-examination the witness said, "If that *small* concentration was typical of the whole place, it would be *difficult* to pick it up with magnaflux."   (Italics supplied.)

Witness Haga nowhere undertook in his testimony to say that the inclusions in question were present in "reasonable concentration," and moreover, he says that discovery of the inclusions in question in this case by the recognized test would be difficult.

There is no testimony given by any witness in the case that the test by magnaflux, the recognized standard, would have disclosed on reasonably exercised diligence, the presence of the inclusion pits, the weakening consequence of which (under plaintiff's theory) caused the breaking of the connecting rod.

The trial court was in error in supposing the testimony of witness Haga sufficient to prove the negligence of defendant, as showing want of diligence in examination of parts to go into the engine.

Plaintiff further argues that another method for discovering the flaws like that found in the connecting rod in question is by use of X-ray but failed to produce any competent testimony to show that the

use of X-ray would have timely discovered the defect in question. On the contrary, plaintiff's witness Paasche testified on redirect examination that the magnaflux test is more efficient and sensitive, in effect, than the X-ray test.

Plaintiff further claims in his brief on appeal that defendant was negligent in not running the engine in question, and afterwards taking the engine apart and using magnaflux on the various parts, and ascertaining their freedom from defects which may have been latent before running the engine. But plaintiff failed to make any showing that experience had proven the practicability or standardization of such test. Plaintiff did show that fatigue cracks might develop by such tests. Under the showing in the instant case, it would be pure guesswork to say at what point in number of revolutions or hours the test, if made, would have timely disclosed the defect in question.

While plaintiff failed to make a showing of lack of diligence on the part of defendant, the defendant showed its diligence. Virgil Moser, defendant's witness, aviation safety agent for Civil Aeronautics Administration, testified after examination of defendant's operations:

"The method of inspection followed by Continental Motors in making these parts complies and conforms with standards required by Civil Aeronautics Administration; likewise the method of manufacturing or producing the parts."

It is unnecessary to consider the testimony as to whether the breaking of the connecting rod or the breaking of the stud or the stud nut, was the original cause of the breakdown of the engine. That was a disputed, jury question. Assuming, in view of the verdict, that the breaking of the connecting rod was the beginning of the breakdown of the engine, still

plaintiff has not shown negligence on the part of defendant respecting the installing of the connecting rod or testing it before or after installing it in the engine.

We do not overlook the testimony of plaintiff's witness Stevens referring to the break of the piston end of the connecting rod in question, "It is a flaw in the forging. * * * Definitely it was not checked. It would have shown up." But the witness further testified:

"*Q.* What test do they make? * * *
"*A.* Well, I don't understand what they make, but I understood they run parts as critical as this through an X-ray machine on an assembly line to show up flawed parts. Whether they do on anything as small as this I am not sure, but they should.
"*Q.* Do you know anything about the magnaflux process?
"*A.* No, I don't."

It is apparent that his statement, "It would have shown up," is the expression of an opinion which has no basis on any knowledge of the witness and is without evidentiary force.

The case of *MacPherson* v. *Buick Motor Co.*, 217 NY 382 (111 NE 1050, LRA1916F 696, Ann Cas 1916C 440, 13 NCCA 1029), was brought to recover damages because of personal injuries caused by reason of a defective wheel of an automobile sold by defendant to a dealer by whom the automobile was sold to plaintiff. The wheel was the product of another manufacturer. The wheel was defective and the defect was the cause of the injury to plaintiff. The defect of the wheel could have been discovered by reasonable inspection, which inspection was omitted.

The opinion in the *MacPherson Case* among other things stated as follows (p 394):

"It [defendant] was a manufacturer of automobiles. It was responsible for the finished product. It was not at liberty to put the finished product on the market without subjecting the component parts to ordinary and simple tests. *Richmond & Danville R. Co.* v. *Elliott,* 149 US 266, 272 (13 Sup Ct 837, 37 L ed 728). Under the charge of the trial judge nothing more was required of it. The obligation to inspect must vary with the nature of the thing to be inspected. The more probable the danger the greater the need of caution."

In the instant case the testimony shows that the defect could not have been discovered by reasonable inspection, thus the instant case is differentiated from the *MacPherson Case.*

The New York court further ruled in *Smith* v. *Peerless Glass Co., Inc.;* 259 NY 292 (181 NE 576), at page 296, "There was, therefore, a duty to use reasonable care. Reasonable care consists among other things in making such inspections and tests during the course of manufacture and after the article is completed as the manufacturer should recognize as reasonably necessary to secure the production of a safe article," with which rule the defendant in the instant case is shown to have complied.

It is unnecessary in this case to review exhaustively the authorities as to liability of manufacturer when negligence is shown because the negligence counted on in the instant case was not shown.

For failure to prove the negligence which plaintiff counted on, plaintiff was without a sufficient case to go to the jury.

The judgment appealed from is reversed. The case is remanded to the trial court for entry of a judgment for the defendant of no cause of action. Costs of both courts to defendant.

BOYLES, NORTH, DETHMERS, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred.