Robert HOGUE, Plaintiff,

v.

**PERMANENT MOLD DIE COMPANY, a**
Michigan Corporation, Defendant.

Civ. No. 16742.

United States District Court
E. D. Michigan, S. D.

April 15, 1959.

Davidson, Kaess, Gotshall & Kelly, by George H. Gotshall, Detroit, Mich., for plaintiff.

Goldman, Grabow & Katcher, Detroit, Mich., for defendant. G. Cameron Buchanan, Detroit, Mich., of counsel.

O'SULLIVAN, District Judge.

A jury verdict awarded plaintiff $225,-000 for personal injuries. Judgment was entered on the verdict on July 1, 1958. The matter for decision by this opinion is the defendant's motion for judgment notwithstanding the verdict or, in the alternative, new trial. The Court has had the benefit of able and exhaustive briefs and argument by counsel for both parties.

On July 13, 1954, plaintiff, Robert Hogue, was injured as a consequence of the explosion or breaking of a die that was being used in an extrusion operation at the plant of his employer, the Jarl Extrusion Company, at East Rochester, New York. A piece of the broken die struck plaintiff's right eye, so injuring it that it had to be removed. From birth, his left eye had only slight vision, and at the trial he stated that the vision of his left eye was like looking through a heavy fog. He said he was able to go out and walk around by himself, that he could see shapes; his counsel then standing before him, he stated he could see counsel's shape, but could not make him out; he stated he could see the jury, "blurred" but he would have to get closer to them than where he was in the witness box to determine how many were women and how many were men. By use of a magnifying glass which he held to his left eye, he was able to read an American Airlines baggage check which was presented to him, reading the names of cities on the check and the check number. He had a plastic eye in the socket of his right eye. In addition to the loss of the right eye, there was damage to the right lower eyelid, with loss of lid margin. This, he claimed, caused him difficulty with the plastic eye. It came out at times. He testified that on his trip from New York to Detroit for the trial, in the airplane this eye came out. He further testified that after he had worn the plastic eye for more than two hours, he experienced a sensation which he compared to a dull toothache. At home, he wore a black patch most of the time.

No doctors testified as to the amount of vision that remained in plaintiff's left eye, nor as to its usefulness and the likelihood of the vision thereof improving or deteriorating. By stipulation, the report of a doctor who examined plaintiff for the defendant was admitted in evidence in lieu of direct medical testimony. After describing the enucleation of the right eye, and the damage to the lid thereof, the report concluded:

"Left eye: Visual acuity is 20/200 unimproved with correction. Visual field studies demonstrate an absolute central scotoma, which accounts for the lowered visual acuity in this eye. Peripheral field studies are normal. Fundus examination is normal.

"In summary: The right eye has been enucleated. Best obtainable visual acuity is 20/200 in the left eye; this eye demonstrating an absolute central scotoma accounting for his marked diminution in vision."

The medical term "scotoma" was defined as:

"A blind or partially blind area in the visual field. Appearance as of dark, vanishing, cloudy patches before the eyes."

While there was no professional testimony on the subject, it is rather assumed that with his injuries, he is permanently industrially unemployable. Except for the injury to the right eye and the congenital difficulty with the left eye, the plaintiff apparently had good physical health. Plaintiff was thirty-four years old at the time of his injuries. He had a wife and a son and daughter, eighteen and nine years of age, respectively, at the time of the trial. He finished the tenth grade in school. His first work was as a waiter in a diner.

Until it was removed, plaintiff had had good vision in his right eye. He served in the infantry during World War II, entering the service in 1943, and was wounded in action overseas. He used an M–1 rifle and was given a sharpshooter's rating. He also operated a .50 caliber machine gun. He was discharged from the Army in 1946. He was thereafter engaged in various employments such as bartender, radio operator and cab driver. He went to work for the Jarl Extrusion Company in June, 1954. His base rate of pay was $1.45 per hour. With overtime, in the first week of his employment he earned $97 and in the second, $111. He was injured during the third week of his employment.

Jarl Extrusion Company had purchased from the defendant, Permanent Mold Die Company, a steel die for use in the process of extruding aluminum shapes. Negligence was charged against defendant in the manufacture of the die in question. It was generally claimed that the die was defective, both in strength of material and in the design of the die. The die which was in use on the day of the accident was the second die that had been designed by the defendant company for Jarl Extrusion Company. It was claimed generally that in designing the die it had been weakened and so constructed as to allow movement which exposed it to the danger of breaking upon exertion of the pressure that was to be expected in the extrusion operation for which it was intended. To sustain its claim of negligence on the part of defendant, plaintiff offered as a witness Professor Richard F. Eisenberg, a professor of Metallurgy at the University of Rochester, New York. He gave opinion evidence that the defendant's die had been improperly manufactured, both from the standpoint of its design and of the materials used therefor, having in mind its intended use in the extrusion process. He testified that its explosion or breaking was, in his opinion, a consequence of negligence in the design and construction of the die in question.

I. Motion for Judgment Notwithstanding Verdict: Defendant argues that the testimony of Professor Eisenberg, upon which plaintiff relies, did not justify submitting the case to the jury: first, because it is claimed that Professor Eisenberg was not qualified to express the opinions he did; second, that his testimony should have been stricken, in that in his calculations and conclusions he failed to take into account the coefficient of friction that would be involved in the extrusion process, that such was a necessary element and failure to evaluate the same destroyed the validity of his opinion; and third, that testimony by defendant's witnesses completely demonstrated the error of Professor Eisenberg's calculations.

■ (a) *Qualifications of Professor Eisenberg:* Professor Eisenberg of Rochester, New York, was 38 years old at the time of his appearance as a witness, and was then a Professor of Metallurgy at the University of Rochester, where he had been teaching the subject of Metallurgy and Materials for twelve years. He stated that the subject of Metallurgy and Materials involved the study of all metallic materials, their behavior under various conditions and their adaptations for various uses. Following High School, he attended Rochester Institute of Technology, receiving there a diploma from its mechanical engineering department. He then attended the University of Rochester, and in 1944 received a Bachelor of Science Degree in Mechanical Engineering. After receiving his Bachelor of Science Degree, he worked at Oakridge, Tennessee, with the Atomic Energy Commission for eighteen months. Thereafter, he returned to the University of Rochester as a full-time instructor, taking work for his Master's Degree in Metallurgy, which he received in 1948. At the time of trial, he was an Associate Professor, specializing in Metallurgy and Materials. He stated he taught a course in Theoretical Physical Metallurgy, which presents the underlying principles of the behavior of metals;

and also a course in Engineering Metallurgy, which is a survey of all metallic materials and fabrications. His teaching covered the study of ferrous and non-ferrous metals, the latter including aluminum, copper and its alloys. In addition to his work at the University, he acted as Metallurgical Consultant for various industrial concerns. These included Ford Motor Company in the Rochester area, two divisions of General Motors Corporation, General Electric Company in Trenton, New Jersey, the Coleman Company in Wichita, Kansas, and American Standard Company, Elyria, Ohio, and local industries in Rochester, New York, such as the Eastman Kodak Company and Bausch & Lomb. He stated that a large part of the work he did as a consultant was the running of tests and giving opinions on material failures, on ferrous metals such as iron and steel. The particular equipment involved in the extrusion operation in question was what is known as an Esco Press. Professor Eisenberg had not been acquainted with an Esco Press prior to being consulted following the injuries to the plaintiff. He had not previously observed one in use and had no previous experience with the extrusion of aluminum and he did not claim to be an expert in that regard. He did testify, however, that in his study of metals, he included the study of aluminum.

The testimony of Professor Eisenberg involved his description and discussion of the steel die manufactured by the defendant, its tensile strength and its claimed improper design. He expressed opinions as to the reasons why the die, at the time in question, failed. He gave his opinion that the die was inadequate to withstand the pressures that were placed on it both from the standpoint of its tensile strength and of its design.

 This Court is of the opinion that Professor Eisenberg's testimony was not excludable because of his claimed lack of qualifications. The fact that he had never worked with the particular press involved or specialized in or had experience with the extrusion of aluminum, would not necessarily disqualify him from giving his testimony as to reasons for the failure of the die. He testified that his education and experience enabled him to form a creditable judgment upon the reason why the die in question failed in the operation involved. It was for the jury to weigh his testimony and to form a judgment as to the amount of credibility that should be given to it.

Professor Eisenberg's testimony in this case disclosed limitations upon his experience not unlike those of a witness whose conclusions, as being sufficient to take a case to a jury, were under consideration in the case of Sitta v. American Steel & Wire Division of the U. S. Steel Corp., 6 Cir., 254 F.2d 12, 15. That case arose in this district court, and in holding that the testimony of Dr. Howell of Wayne University, a professor of Mechanical Engineering, was sufficient to take the case to the jury, Judge Miller of this Circuit said:

"Dr. Howell gave his reasons for such conclusions. (These conclusions included his expressed reasons for the breaking of a cable) He frankly admitted that he never participated in the manufacture of wire rope, that he had never seen wire rope manufactured, that he did not know what kind of machine was used by the defendant to manufacture the wire rope, and that he did not claim to be a wire rope expert."

In considering the testimony of a witness whose qualifications were similar to those of Professor Eisenberg, the Third Circuit in the case of Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825, 828, 829, had before it a case in which the plaintiff was injured through the disintegration of a grinding wheel. An expert for the plaintiff had given his conclusions as to the cause of the disintegration. The Court said:

"Defendant contends, however, that this evidence is inadmissible because plaintiff's expert was not qualified to testify with respect to prac-

tices in the abrasive wheel industry. It is admitted that the expert, one Dr. Peskin, is a graduate engineer, with extensive experience in industry. His specialty is the strength of materials, and he has had considerable theoretical training in that field at Massachusetts Institute of Technology. He was an instructor at that institution, and received his Doctor of Science Degree there in 1936. Defendant asserts that Dr. Peskin was not qualified to testify because he has had no practical experience in the manufacture of abrasive wheels."

In holding that the trial court did not abuse its discretion in allowing the witness' answers to be received, the Court said:

"It is hardly within the province of this court to determine what is the optimum degree of specialization in the scientific world. We note in passing, however, that the wider perspective of the broad specialist may be of invaluable assistance to the trier of fact; the narrow specialist, on the other hand, may be limited by occupational myopia. At any rate, these questions are matters for the trial court, and we cannot say that the district court abused its discretion."

This Court is of the opinion that the testimony of Professor Eisenberg disclosed qualifications which justified receiving his opinions upon the cause of the break of the die in question.

(b) *Failure of Professor Eisenberg to consider the coefficient of friction:* Professor Eisenberg had made various calculations to support his opinion that the die in question was defective, determining the amount of pressure that was to be exerted on it in the operation in question. On cross-examination, it was brought out that in extruding an aluminum billet through a die, friction is created which would have a bearing on the amount of pressure exerted on the die. This was described as the coefficient of friction. Professor Eisenberg admitted that he had not attempted to calculate the coefficient of friction involved in the operation in question, and that without actual testing he would be unable to calculate the coefficient of friction. Because he conceded that he had not made such calculations, defendant's counsel urged that his testimony relating to the cause of the die's breaking should have been stricken. This Court did not think so at the time testimony was received, and believes now his ruling was correct.

Notwithstanding Professor Eisenberg's concession that he had not calculated the coefficient of friction, he stated that its not having been included did not detract from the validity of his conclusions or the opinions expressed by him. On this subject, the Professor said:

"Q. Don't you think, therefore, that the frictional forces necessarily should be computed to give the jury a fair answer to this case? A. I don't think it is absolutely necessary. The conditions here give us order of magnitude, which I have stated, indicating that the stresses and the forces are extremely high, even although the friction would act to cut down the forces to some degree, I don't think the calculations are seriously in error.

\* \* \* \* \* \*

"Q. Whether we accept your opinion, my opinion, or the opinion that the jury comes to, these figures exclude entirely some force, is that right? A. That's right.

"Q. And is it fair to say that up to this time you have not attempted to compute it? A. I have considered it, and because of the condition that aluminum is in, being rather soft, plastic under the conditions of extrusion, that I have decided that these figures, as they stand, would be of a proper magnitude."

The above, in this Court's opinion, amounts to the Professor's assertion that his failure to calculate the coefficient of

**234**

friction did not impair the validity of his conclusion.

The defendant produced a Professor from Wayne University of Detroit, who recited qualifications comparable to those of Professor Eisenberg—an impressive scholastic record and extracurricular work as an engineering consultant. He arrived at different conclusions than did Professor Eisenberg. Other witnesses with practical experience in the extrusion of aluminum attacked the testimony of Professor Eisenberg. This is not unusual in cases involving scientific problems such as this case presents. It was for the jury to weigh the evidence of the experts, and to appraise the credibility of each.

■ (c) *Did defendant's witnesses destroy the probative value of the Eisenberg testimony?* Defendant's experts and other witnesses sharply disagreed with Professor Eisenberg. This Court, however, is of the opinion that their testimony did no more than raise an issue as to the validity of his conclusions. It was for the jury to resolve such issue. This Court is of the opinion that the verdict of the jury as to liability was not against the great weight of the evidence.

II. Motion for New Trial: To support this alternative motion, defendant asserts that the verdict was against the great weight of the evidence; that it was excessive; that there was not sufficient or substantial evidence to support it; that it appears to have been given under the influence of sympathy, passion and prejudice; and that the Court erred in failing to strike the testimony of plaintiff's witness Eisenberg.

This Court does not feel that the jury's verdict was against the great weight of the evidence, and for the reasons recited hereinabove, is of the opinion that it was not error to refuse to strike the testimony of plaintiff's witness Eisenberg.

■■ *Excessive verdict:* The verdict in the sum of $225,000 was, indeed, spectacular. This Court is advised that it was the largest verdict ever rendered in

this District in a personal injury case. These reasons alone, however, do not call for its reduction, nor the granting of a new trial. It is not necessary to here repeat the language of the many decisions which have dealt with the question of a trial court's right, discretion, or duty to reduce a verdict or to grant a new trial when such court believes that it was excessive. The accepted rule is that a trial court will not set aside or interfere with the verdict of a jury unless it is in such an amount as to shock the conscience of the court or to cause the court to believe that it was the result of sympathy, passion or prejudice, or that the jury in fixing the amount were motivated by factors that should not have been taken into consideration by them in arriving at their verdict.

"It is sufficient to state here that, where the recovery is not a mere matter of computation, it will not be interfered with, unless so excessive or so grossly inadequate as to be indicative of prejudice, passion, partiality, or corruption upon the part of the jury, * * * or upon a consideration of elements not within the scope of the action. The court should merely consider whether the verdict is fair and reasonable, and in the exercise of sound discretion, under all the circumstances of the case, and it will be so presumed, unless the verdict is so excessive or outrageous with reference to those circumstances as to demonstrate that the jury have acted against the rules of law or have suffered their passions, prejudices, or perverse disregard of justice to mislead them. There is no absolute or definite rule for determining whether the damages awarded are excessive. The Courts must be governed in a measure by the circumstances of the particular case presented for their consideration, and where the circumstances of the particular case or the evidence produced indicate that the verdict has been the result of bias, prejudice, or gross overestimate,

they have not hesitated to set it aside." 25 C.J.S. Damages § 196, pp. 910–912.

This Court feels that no purpose would be served by repetitious citing of authorities from Michigan and elsewhere on this subject. The above text is a comprehensive statement of the rule.

It is recognized at once that the size of this verdict undoubtedly was the result of the jury's attempt to measure in dollars the loss that comes to any human being from being substantially deprived of possibly the most valuable of all human senses, that of sight. It will be recognized, too, that no normal man would voluntarily take any amount of money in exchange for the loss of his eyesight. That, however, would not justify a completely fantastic award of damages for such a tragedy. The fact that voluntarily one would not accept a million dollars in exchange for his eyes does not argue that a recovery of one million dollars should be sustained, should a jury make such an award.

In the case at Bar, the Court can say that nothing happened on the trial of this case which was calculated to arouse passion, prejudice, or undue sympathy on the part of the jury, unless the mere presence of the injured plaintiff in the courtroom created such emotions. The case was well tried by able counsel who conducted themselves with restraint; there was no bitterness evidenced, nor were there unusual demonstrations. The plaintiff, as a witness, gave a factual account of his injuries and their consequences to him. He did not reappear on the stand after giving his testimony at his first appearance thereon. The Court recalls no objectionable conduct on the part of plaintiff's counsel in arguing the case to the jury. The jury was well balanced with people from various walks of life and, evidently, from the length of their deliberations, gave careful consideration to their grave responsibility in fixing damages to be awarded to this plaintiff. As indicated above, there was no clash of medical experts or contest over the extent and character of plaintiff's injuries. The trial was conducted in an atmosphere of calm and most of its time was consumed by the evidence of experts in their opposing contentions as to the cause of the breaking of the die in question. Accordingly, this Court cannot charge the size of this verdict to any prejudice that may have arisen against this defendant, nor to dramatizing or overplaying of the plaintiff's injury.

The Court's charge on damages was relatively short. On plaintiff's loss of eyesight, it was as follows:

"* * * in your deliberations * * * and in your arriving at a verdict, you are to do so without bias, prejudice or sympathy for or against any of the parties in this case.

"There has been some evidence in this case as to the impairment of vision of plaintiff's left eye. It is conceded that the impairment of vision of plaintiff's left eye was with him prior to the accident of July 13, 1954, and that that accident did not in any manner impair the vision of his left eye. Therefore, you cannot award the plaintiff any damages on any assumption that there was any impairment of vision in plaintiff's left eye as a result of the occurrence involved in this case. You may, however, take into consideration the fact of the limited vision in the left eye in determining the extent of damages that this plaintiff may have suffered by reason of the total loss of his right eye, if, of course, you find that the plaintiff is entitled to recover in this case.

"If you find that the plaintiff is entitled to recover, then you should proceed to the question of damages. If you find that the plaintiff is not entitled to recover, then, of course, you would not reach the question of damages.

"But if you find that the plaintiff is entitled to recover, then it is your duty to award him such an amount

of damages as will fairly and justly compensate him for the injuries which he has received. In this connection, you have the right to take into consideration the nature and the character of the injuries, whether serious or slight, whether temporary or permanent, also the physical and mental pain and suffering that he underwent at the time he was injured, if any, his subsequent suffering, if any, up to this time, and the mental and physical pain that you find it is reasonably certain he will suffer in the future as a result of his injuries. There is no fixed standard of measuring that, and for that reason the law leaves this question of the amount of pain and suffering and its lasting effect upon the plaintiff, if any, to your sound judgment and common sense, under all of the circumstances and based upon the evidence in the case. Also, you shall consider what damages the plaintiff has sustained, if any, in decreased capacity to earn money, not only up to this time, but also in the future, if you find that his future earning capacity has been diminished as a result of his injuries."

The balance of the charge on damages had to do with advising the jury on the question of limiting any award that they might make for future damages to the present worth thereof. This covered both loss of earning capacity and future pain and suffering, the Court telling the jury that on both of these elements they should consider only present worth of damages accruing to the plaintiff in the future.

Defendant's briefs cite cases in which excessiveness of verdicts was tested by determining what income a recovery would yield if invested at a certain rate of interest, pointing out that such yield would provide an income equal to or in excess of the earning ability of a particular plaintiff, leaving such plaintiff at the end of his life still in possession of the principal amount of the awarded damages. This Court recognizes the propriety of such tests, but they are not entirely controlling here. It is obvious that if the amount of this verdict, $225,000, was invested with a yield of anywhere from three to five percent, it would produce income substantially in excess of the amount of plaintiff's earnings at the time of his injury. That fact alone, however, does not make it necessary to set aside or reduce this verdict. This Court is not here dealing solely with loss of earning capacity. It is obvious that the largest part of this verdict represents the jury's effort to compensate plaintiff for what loss of sight was consequent on his injuries.

Briefs of counsel give computations of the present worth of the plaintiff's loss of earnings, assuming that he would continue to be totally disabled and assuming a range of earnings from $3,016 per year, based on $1.45 per hour for a forty-hour week, to $5,000 per year, which assumes that he would earn close to $100 a week, having in mind that his last week's pay, with overtime, was $111. Adding the loss of earnings accrued to time of trial to these calculations of present worth of future loss of earnings, they show a range from about $65,000 to $100,000. This Court, of course, does not know just how the jury compiled the figures that went into the total verdict. An arbitrary assumption of the mean between the above totals for past and future loss of earnings, namely, $82,500, would allocate $142,500 of the verdict to general damages for the plaintiff's loss of sight. Is such an award for loss of sight so grossly excessive as to require the unconditional granting of a new trial?

The Court advised the jury that for pain and suffering they were to award him such an amount of damages as "will fairly and justly *compensate* him for the injuries he has received. * * * "

The word "compensate" in Webster's dictionary is given the meaning, "to be equivalent in value or effect to; to counterbalance; *to make up for*."

No amount of money can restore plaintiff's eyesight, nor take away the mental and physical pain—the loss of the flavor of living—that will come to him because of his injury. A substantial amount of money may, however, help to "make up for" his loss, by providing him with means to acquire some new skills, both for work and play, and afford him pleasures that, at best, will be poor substitutes for the God-given ability to see. This Court has considered the present value of the dollar, and read cited cases in which verdicts in amounts comparable to the one here have been sustained. In some of these other types of injuries were involved, such as loss of both legs. It would be difficult to decide whether the loss of both legs would be a greater loss than blindness, or if a human being had to choose between the two, which he would accept as the better tragedy. This Court should, and does, consider what other judges have done with verdicts in various amounts. A review of them, however, does not provide this Court with any mathematical standard.

If the evidence in this case disclosed that plaintiff would be completely and totally prevented from ever again earning any money, and if he was, by defendant's tort, made totally blind, this Court would have no hesitancy in finding that he should not interfere with the jury's verdict. This Court also states that this verdict did not shock the conscience of the Court. The Court does not believe that the verdict was the result of passion, prejudice, or undue sympathy, nor that the jury's deliberations were corrupted by taking into account factors inappropriate to such deliberations. Accordingly, the Court will deny the unconditional grant of a new trial.

This Court, however, feels that this verdict should be reduced, and points out the following:

1) We may assume that the plaintiff is permanently and totally unemployable, industrially. But considering that he can get about by himself and can, with the aid of a glass, do some reading with his left eye, it is more than likely that he will be able to find some way of earning some money, however modest in amount. There was no evidence that the remaining sight of his left eye would deteriorate. Apparently, he is entirely able physically, except for his loss of vision. By using some part of the recovery in this case, he may indeed, as so many others handicapped as he is, establish some gainful enterprise. The calculations as to the present worth of his loss of earnings, referred to above, were all made on the assumption that he would never again earn anything.

2) On the question of future mental and physical suffering, we are not dealing with complete blindness. This plaintiff is not reduced to the difficulties or embarrassment that attend the use of leader dogs or other aids to permit him to get about. He has some usable vision. If, as indicated above, he uses some part of his recovery to provide a means of self-employment, the activity and interest of it may, aside from the money, in some measure assuage the mental hurt of his disability.

3) The defendant in this case was not responsible for the condition of the plaintiff's left eye. Such congenital defect tragically coincided with defendant's tort to aggravate its consequences. This Court believes that on the question before him some consideration should be given to this circumstance. A defendant who has committed a civil wrong must bear the burden of it. But a trial judge should concern himself with fairness to such a defendant, as well as adequate compensation to a plaintiff.

After careful review of all of the factors involved and consideration of the reasons just mentioned, this Court is of the opinion that the verdict should be reduced to the sum of $175,000. If the plaintiff elects to accept such reduction by filing an appropriate remittitur within fifteen days from this date, the motion for new trial will be denied and the judgment, thus reduced, remain in force. If such remittitur is not so filed, an order will be entered setting aside the ver-

dict and judgment and granting a new trial. The defendant's motion for judgment notwithstanding the verdict will be denied.

An order, or orders, in conformity herewith may be presented for signature.