FARR v. WHEELER MANUFACTURING CORPORATION

1. WITNESSES—EXPERT WITNESSES—QUALIFICATIONS—DISCRETION.

   The determination of the qualification of an expert witness is within the discretion of the trial judge and appellate courts only interfere to correct an abuse of discretion.

2. WITNESSES—EXPERT WITNESSES—HYDRAULIC PIPE CUTTER.

   Plaintiff's expert witness, an associate professor of mechanical engineering, should have been allowed to testify that a chain on a hydraulic pipe cutter was not made of material sufficient to withstand the stress produced by the machine, even though he had no practical experience in the hydraulic pipe cutter manufacturing industry where there was hardly such a thing as a hydraulic pipe cutter manufacturing industry since the defendant was the only company making such a product and it merely assembled parts made by others on contract.

3. PRODUCTS LIABILITY — NEGLIGENCE — MANUFACTURERS — DESIGN — REASONABLE SAFETY.

   A manufacturer must use reasonable and ordinary care under the circumstances in planning or designing his product so that it is reasonably safe for the purposes for which it is intended.

4. PRODUCTS LIABILITY—DESIGN—REASONABLE SAFETY—EVIDENCE.

   Merely proving that an injury would not have occurred had a particular product been differently designed does not necessarily establish a breach of duty as to design; a showing that a large number of the products were used without injury is not conclusive proof that the product is reasonably safe.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 31 Am Jur 2d, Expert and Opinion Evidence §§ 24–32.
[3–5] 46 Am Jur, Sales § 356 et seq.

5. PRODUCTS LIABILITY—NEGLIGENCE—DESIGN—STANDARD OF CARE.
There would never be any reason, insofar as liability for faulty
design is concerned, for an industry to improve if the standard
of care for an entire industry is conclusively established by
what those in the industry do.

Appeal from Wayne, Edward S. Piggins, J.
Submitted Division 1 February 5, 1970, at Detroit.
(Docket No. 5,309.) Decided June 22, 1970. Application for leave to appeal filed July 10, 1970.

Complaint by Florence Farr against Wheeler
Manufacturing Corporation and Ellis and Ford
Manufacturing Company for damages resulting
from an industrial accident which caused the death
of her husband. Directed verdict granted defendant. Plaintiff appeals. Reversed and remanded.

*Robert B. Tatham* (*Norman L. Zemke,* P. C. of
counsel), for plaintiff.

*Vandeveer, Doelle, Garzia, Tonkin & Kerr,* for
defendants.

Before: LEVIN, P. J., and GILLIS and BRONSON,
JJ.

BRONSON, J. On October 20, 1961, James Farr,
the decedent, was injured in an industrial accident.
Farr, an employee of Rudoni Excavating Company,
was working on a drain project and was called upon
to cut a 12 inch sewer pipe. His employer borrowed
a hydraulic pipe cutter from the City of Lincoln
Park. This machine was manufactured by defendant Wheeler Manufacturing Corporation and distributed by defendant Ellis and Ford Manufacturing Company.

To operate this machine, a chain is wrapped around the pipe to be cut, a valve is closed, and the machine is pumped. When enough pressure is obtained, the pipe will break, making a "pinging" noise.

On the day in question, Farr and a co-worker were in the process of cutting a 12 inch pipe. When the machine had been pumped 10 times, Farr heard a "ping" and thought the pipe had been cut. However, when the pipe did not fall apart, Farr bent over to see if the pipe had broken. At that instant, the chain broke and struck him in the head, causing his death.

Florence Farr, the decedent's wife, individually and as administratrix of James Farr's estate, brought suit in Wayne County Circuit Court against defendants alleging negligence and breach of express and implied warranties. The count alleging breach of express warranty was dropped at trial.

Plaintiff's theory of the case was that the machine was unsafe because the pins in the chain were not large enough to withstand the pressure that would be exerted by normal use. In furtherance of this theory, Dr. Despres, a mechanical engineer and associate professor at the University of Michigan, testified that the chain was not made of a material sufficiently strong to withstand the stress produced by the machine.

At the conclusion of Dr. Despres' testimony defendant first moved that Despres' testimony be stricken because he was not qualified as an expert witness and, second, moved for a directed verdict.

The trial court below granted both defense motions. The key and only issue in this appeal is whether the lower court erred in ruling that plaintiff's expert witness was not qualified to express an opinion. Dr. Thomas A. Despres was plaintiff's

expert. He holds a bachelor's degree in industrial engineering, a master's degree in mechanical engineering, and a Ph.D. in mechanical engineering. He was employed at the University of Michigan as an associate professor of mechanical engineering, and had been employed in a teaching capacity at the University of Michigan since 1959. He testified that he was a mechanical engineer; that mechanical engineering is the study of applied physics, practically applying the study of physics to engineering problems; that a mechanical engineer is a design engineer; and that mechanical engineering encompasses machine design and mechanical properties of metals. The record further discloses his testimony that the study of mechanical properties of metals is a study of the behavior of metal under the actions of environment, forces, and practical use. A mechanical engineer, Dr. Despres testified, begins with his metallurgical knowledge and from this determines what and how metals act under load, the magnitude of their strength, and what stresses will do to reduce metal strength.

Dr. Despres testified in great detail concerning the treatises upon which he had worked, the courses he taught, and his theoretical and practical background, including his assisting in the preparation and writing of a book dealing with stress, strength, and design.

Dr. Despres stated that within the field of mechanical engineering he had a specialty of mechanical properties and design, as well as metallurgical and failure analysis, which are subdivisions of mechanical properties and design. He stated that design is the main aim of mechanical engineering, and its ultimate purpose; that, in fact, the aim of most all engineering is to culminate in a design or an evaluation of a design for utilization by peo-

ple; that he himself had designed certain machinery, both for his students and for industry. Further, he stated that particularly he taught machine design to graduating seniors and that, on the graduate level, he taught application of advanced metallurgical principles to design, with stress and strength considerations.

Both parties agree, citing *Accetola* v. *Hood* (1967), 7 Mich App 83, that the determination of the qualification of an expert witness is within the discretion of the trial judge, that appellate courts only interfere to correct an abuse of that discretion.

Plaintiffs urge, however, that the trial court did abuse its discretion in the instant case. Neither defendants nor the trial judge dispute Dr. Despres' eminent qualifications in the field of mechanical engineering. The trial judge nevertheless refused to qualify him as an expert because he knew nothing about the pipe cutter except what he concluded as a result of his mathematical computations. He never saw the device prior to two months before the trial, never built one, nor worked on one. He did not see the fractured part which had mysteriously disappeared.

The thrust of Dr. Despres' testimony was that the strength of the pins in the chain was not adequate to withstand the pressures exerted in the operation of the machine.*

---

\* The Detroit Testing Laboratory had done a metallurgical analysis of the broken pin and determined that it had a tension yield strength of 242,000 pounds per square inch. Using this figure, Dr. Despres applied a number of mathematical formulae and determined that the amount of stress the pin would withstand would be 140,000 pounds per square inch before it would bend and deform permanently. The amount of stress that would be required to break the pin would be 152,000 pounds per square inch. Dr. Despres stated that accepted mechanical engineering design practice dictated that material strength should have a safety factor of from two and one-half to three times greater than the force to be applied against it. This, according to Dr. Despres, is design practice and was an accepted standard of

Plaintiffs urge that the trial court abused its discretion by disallowing the testimony of Dr. Despres. Dr. Despres was acknowledged to be eminently qualified in the general field of mechanical engineering by the trial judge. The objection of the trial court was that he did not know the actual standard of care of design in the hydraulic pipe cutting industry in 1960, although he could testify concerning the design requirements of mechanical engineering in general, and concerning both the theoretical and practical requirements of industry in the application of generally accepted mechanical engineering principles. Dr. Despres stated that these universal principles ought to have been applied in the hydraulic pipe cutting industry, as well as in all industries.

The testimony of defendant Wheeler's president is significant, in that it showed that there is hardly such a thing as a "hydraulic pipe cutter manufacturing industry". Wheeler Manufacturing Corporation is the only company actually producing such a product and it merely assembles parts made by others on contract. Wheeler Manufacturing Corporation itself manufactures nothing. Further, there are two other manufacturers of pipe cutters, but neither of these work on the hydraulic principle.

Under these circumstances we are persuaded that Dr. Despres should have been allowed to testify even though he had no practical experience in the "hydraulic pipe cutter manufacturing industry". See *Sitta* v. *American Steel and Wire Division of United States Steel Corporation* (CA6, 1968), 254 F2d 12, 16. See, also, *Trowbridge* v. *Abrasive Company of Philadelphia* (CA3, 1951), 190 F2d 825, 829; *Hogue*

---

mechanical engineering practice in 1960 when the pipe cutter was manufactured.

v. *Permanent Mold Die Company* (ED Mich, 1959), 177 F Supp 229, 232.

Defendant vigorously contends that Dr. Despres' testimony was inadmissible because the jury was not given any standard of care in the industry in order that it might measure defendant's actions. As authority for that position, *Barton* v. *Myers* (1965), 1 Mich App 460, is cited, in which the Court stated:

"The case is governed by *Cheli* v. *Cudahy Brothers Co.* (1934), 267 Mich 690, wherein it is said at page 695:
" ' "No one is held liable to a higher degree of care than the average in the trade or business in which he is engaged." *Ketterer* v. *Armour & Co.* (CA2, 1917), 160 CCA 111, 121 (247 F 921, 931; LRA1918D, 798).' "

But this Court has retreated from that standard as is seen in *Witt* v. *Chrysler Corporation* (1969), 15 Mich App 576, when we stated:

"In support of its contention that the law does not hold it to a higher degree of care than the average in the industry, defendant relies on *Cheli* v. *Cudahy Brothers Company* (1934), 267 Mich 690; *Barton* v. *Myers* (1965), 1 Mich App 460; *Doutre* v. *Niec* (1965), 2 Mich App 88, and *Livesley, supra* [(1951), 331 Mich 434].
"Literally, the language of *Cheli, supra,* supports defendant's position that legally it is not held to a higher degree of care than the average in the industry. However, it was shown in *Cheli* that 'there is no known practicable or feasible method of determining whether hogs are infested with trichinae.' We do not accept *Cheli* as sound authority for the proposition here advanced by defendant.
"*Barton, supra,* involves warning, not testing and inspection, and the warning was given in print of a reasonable size. On the facts of *Barton,* the 'higher

degree of care than the average in the industry'
language may not have been inappropriate, but it
certainly is not authority for defendant's claim that
it is held to no higher degree of care than the average
in the industry.   To adopt this view would permit
the industry to set its own standard of care.

"*Doutre, supra,* does not support defendant and as
we read *Livesley, supra,* it fixes the standard of
care to which defendant is held as reasonable care."

*Gossett* v. *Chrysler Corporation* (CA6, 1966), 359
F2d 84, 87, set forth the rule for design liability:

"It is the duty of a manufacturer to use reason-
able care under the circumstances to so design his
product as to make it not accident or foolproof, but
safe for the use for which it is intended.   This duty
includes a duty to design the product so that it will
fairly meet any emergency of use which can reason-
ably be anticipated.   The manufacturer is not an
insurer that his product is, from a design viewpoint,
incapable of producing injury."

The fundamental standard imposed on a manufac-
turer is to be reasonable and prudent under all the
circumstances.   In the area of product design, he
must use reasonable and ordinary care under the
circumstances in planning or designing his product
so that it is reasonably safe for the purposes for
which it is intended.   *Davlin* v. *Henry Ford & Son,
Inc.* (CA6, 1927), 20 F2d 317, 319; Annotation, 76
ALR2d 91, 95; 1 Frumer, Products Liability, § 7.01
[1], p 104; 1 Hursh, American Law of Products Lia-
bility, § 2:59, p 240.   The Restatement of Torts, §
398, p 1084, and comment (a) thereunder, also essen-
tially reflects these principles.

This Court agrees that merely proving that an
injury would not have occurred had a particular
product been differently designed does not neces-
sarily establish a breach of duty as to design.   76
ALR2d at p 99.   We would also state that it is per-

suasive evidence that the duty to design safely was not breached, to show that a large number of the products were used without injury. This evidence is not, however, conclusive proof that the product is reasonably safe.

In *Northwest Airlines, Inc.* v. *Glenn L. Martin Co.* (CA6, 1955), 224 F2d 120; *cert den* (1956), 350 US 937, (96 S Ct 308, 100 L Ed 818), involving negligence in design and manufacture of an airplane, the court said:

"[T]he fact that Northwest conformed to the practice of other airlines in failing to equip No. 44 with radar did not establish its exercise of ordinary care as a matter of law. Customary practice is not ordinary care; it is but evidence of ordinary care." 224 F2d at p 129.

And in *The T. J. Hooper* (CA2, 1932), 60 F2d 737, a contention of unseaworthiness of a ship was made because she was not equipped with radio receiving sets to receive storm warnings. In defense it was shown not to be a general custom among coastal carriers so to equip their ships. One ship line alone did it. The rest did not. Judge Learned Hand said this:

"Is it then a final answer that the business had not yet generally adopted receiving sets? There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. * * * Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; *a whole calling may have unduly lagged in the adoption of new and available devices.* It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." 60 F2d at p 740. (Emphasis added.)

And in *Texas & Pacific R. Co.* v. *Behymer* (1903), 189 US 468, 470 (295 S Ct 622, 623; 47 L Ed 905, 906), Justice Holmes observed: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence whether it usually is complied with or not".

The reasoning and policy behind these expressions seems clear. If the standard of care is conclusively established within an entire industry by what those in the industry do, there would never be any reason, insofar as liability for faulty design is concerned, for an industry to improve. All that the members of an industry would have to do would be to insure that all manufacturers maintain the same standards, regardless of how low or how obviously defective.

We are not unaware of the fact that some industries are so small that it is virtually impossible for an injured party to find an expert with actual knowledge of industry standards. Under such circumstances, there may be only a handful of persons with such knowledge. If they are all employed by the "industry", it is not realistic to expect them to testify that a standard has been breached and negligence committed.

Dr. Despres was not testifying regarding any property peculiar to the pipe cutting "industry". His testimony was directed towards the strength of materials and metallurgical stresses. His testimony did not require any expertise in a particular "industry". What was required was a general knowledge of mechanical engineering. This knowledge Dr. Despres admittedly possessed. Dr. Despres should have been qualified as an expert witness.

Reversed and remanded for new trial.

All concurred.