SCHULTZ v CONSUMERS POWER COMPANY

Docket No. 92313. Argued January 13, 1993 (Calendar No. 11). Decided August 31, 1993. Rehearing denied 444 Mich 1202.

Alice M. Schultz, as personal representative of the estate of Duane L. Schultz, deceased, brought a wrongful death action in the Saginaw Circuit Court against Consumers Power Company, alleging that it negligently failed to inspect and repair an electric wire that fatally electrocuted the decedent while painting a house, and that it negligently installed the wire dangerously close to the residence, permitting electric current to arc from the wire to an aluminum ladder held by the decedent. The court, Robert L. Kaczmarek, J., entered judgment on a jury verdict for the plaintiff. The Court of Appeals, GILLIS, P.J., and WEAVER and DOCTOROFF, JJ., reversed in an unpublished opinion per curiam, ruling as a matter of law that the plaintiff failed to establish that a duty of care was owed by the defendant to the decedent, and characterizing the accident as a fortuitous circumstance, not a contingency reasonably anticipated (Docket No. 118323). The plaintiff appeals.

In an opinion by Justice MALLETT, joined by Justices LEVIN, BRICKLEY, and BOYLE, the Supreme Court held:

Consumers Power has a duty to reasonably protect members of the general public from any foreseeable danger from its power lines.

1. Generally, negligence is conduct involving an unreasonable risk of harm. The requisite elements of a cause of action are that the defendant owed a legal duty to the plaintiff, the defendant breached or violated it, the plaintiff suffered damages, and the breach was a proximate cause of the damages. To determine whether a duty exists, the relationship of the parties and the foreseeability and nature of the risk must be examined. In this case, the relationship between the utility company and the decedent was sufficient to impose a duty. Because electrical energy is inherently dangerous and electric utility companies

REFERENCES

Am Jur 2d, Electricity, Gas, and Steam §§ 10, 11, 18, 111, 120.
See ALR Index under Electricity and Electric Companies; Negligence.

possess expertise in dealing with it, an electric company must exercise reasonable care to reduce potential hazards as far as practicable, including reasonably inspecting and repairing wires and other instrumentalities to discover and remedy hazards and defects.

2. The test of negligence is whether the probability that injury might result from any reasonable activity done on the premises should have been foreseen. In this case, the utility company should have realized that homeowners maintain their homes. Considering the proximity of the uninsulated primary wire to the house, it was foreseeable that someone making repairs could be injured by a dilapidated wire. The defendant's failure to conduct routine inspections of the wires, or conducting them in a careless or deficient manner, made it reasonably foreseeable that use of an aluminum ladder could result in injury or death. Because there was a sufficient relationship between the parties and a foreseeable risk of harm, the utility owed a duty to the decedent to properly inspect and maintain its wires so as to reasonably safeguard against injury or death.

3. Where service wires carry a powerful electric current, so that persons coming into contact with or proximity to them are likely to suffer serious injury or death, a utility must exercise reasonable care to protect the public from danger. The degree of care required is that used by prudent persons in the industry, under like conditions and proportionate to the dangers involved, to guard against reasonably foreseeable or anticipated contingencies. Electric companies must exercise ordinary care to guarantee that equipment is kept in a reasonably safe condition. The duties to inspect and repair involve more than remedying defective conditions actually brought to a utility's attention.

4. Custom and industry practices are relevant to the issue of due care, but they are not dispositive with respect to duty. Compliance with the National Electric Safety Code or an industry-wide standard is not an absolute defense to a claim of negligence. While it may be evidence of due care, conformity with industry standards is not conclusive on the question of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances. A power company has a duty to reasonably install its power lines so as to safeguard the public from foreseeable injuries.

Chief Justice CAVANAGH, joined by Justice LEVIN, concurring, stated that failure to maintain a frayed wire had less to do with the accident in this case than the position of the wire. Because the primary cause of the plaintiff's injury was not the defendant's failure to detect and repair the frayed wire, but the

positioning of an uninsulated power line close to a preëxisting two-story wooden house, the focus should be on the defendant's duty of reasonable care in positioning its uninsulated power line.

Reversed and remanded.

Justice GRIFFIN, joined by Justice RILEY, dissenting, stated that, as a matter of law, the defendant owed the plaintiff no duty, and thus there was no actionable negligence on the part of the defendant. The circumstances of the accident were fortuitous, not reasonably foreseeable. The defendant utilized safety standards in installing its power line that exceed the industry standard and applicable code requirements, and the danger involved was open and obvious.

NEGLIGENCE — ELECTRIC COMPANIES — DUTY TO INSPECT AND REPAIR — FORESEEABILITY.

An electric company must exercise reasonable care to reduce potential hazards as far as practicable, including reasonably inspecting and repairing wires and other instrumentalities to discover and remedy hazards and defects.

*Van Benschoten, Hurlburt, Tsiros & Allweil, P.C.* (by *Lawrence A. Hurlburt*), for the plaintiff.

*W. E. Wisner* for the defendant.

MALLETT, J. In this wrongful death action brought by Alice Schultz, personal representative of the estate of Duane Schultz, we granted leave to determine whether defendant Consumers Power Company owed a duty of care to Duane Schultz to reasonably inspect, repair, and install its electric conductors. The Court of Appeals concluded, as a matter of law, that defendant owed no such duty. We reverse.

I

On July 13, 1983, the decedent, Duane Schultz, was electrocuted while assisting a friend, Keith Osmond, paint his house in Merrill, Michigan. The fatal electric current emanated from defendant's medium-voltage wire, installed in approximately 1937. The line contained two wires, one neutral

and one uninsulated[1] primary wire carrying a current of 4,800 volts. The primary wire was situated roughly fifteen feet, six inches from the house at a height of twenty-four feet.

The two men completed most of the painting from a moveable scaffold. However, to reach the peak of the house, they ascended a twenty-seven foot aluminum extension ladder. Once the peak was painted, Mr. Osmond began lowering the ladder. He testified that he pulled the ladder away from the house and, as it stood vertically, the decedent grabbed the ladder from the other side. At that instant, "there was a brilliant flash," and Mr. Schultz was electrocuted. Mr. Osmond, who survived, denied that the ladder contacted the wire.

Plaintiff filed suit, alleging that Consumers Power negligently failed to inspect and repair the wire that fatally injured the decedent. Additionally, plaintiff claimed that Consumers Power negligently installed the wire dangerously close to the Osmond residence. She asserted that the frayed wire allowed the electric current to "arc"[2] from

[1] Technically, according to defendant, the air space surrounding a transmission line serves as insulation because electricity cannot conduct through air. Nonetheless, the wires at issue were not protected by any tangible insulating cover.

[2] There was considerable disagreement at trial about whether the ladder physically contacted the wire or whether the electric charge "arced." Arcing is a scientifically proven and accepted phenomenon that allows an electric impulse to transmit through the air to another conductive object. It is often caused by pollution that breaks down air molecules. Plaintiff's expert testified that under ideal circumstances, nobody knows how far electricity can arc. He further testified that in ionized and moist air, like that on the day of the accident, electricity arcs farther than in other conditions. Additionally, expert testimony was presented that the ladder could not have touched the line because there were no marks on the ladder indicative of such physical contact.

Plaintiff did not, however, contend that the arc was thrown between three and seven feet as the Court of Appeals suggests. Rather, the evidence simply showed that the base of the ladder was three to

the wire to the nearby ladder. A jury found defendant negligent and awarded plaintiff $750,000. The jury concluded that plaintiff's decedent was not comparatively negligent.

The Court of Appeals reversed, ruling as a matter of law that plaintiff failed to establish that defendant owed the decedent a duty of care. The Court characterized the accident as a "fortuitous circumstance, not a contingency reasonably anticipated." Unpublished opinion per curiam, decided May 22, 1991 (Docket No. 118323), p 2. We granted leave to appeal.[3]

## II

Generally, negligence is conduct involving an unreasonable risk of harm. The requisite elements of a negligence cause of action are that the defendant owed a legal duty to the plaintiff, that the defendant breached or violated the legal duty, that the plaintiff suffered damages, and that the breach was a proximate cause of the damages suffered. *Roulo v Automobile Club of Michigan*, 386 Mich 324; 192 NW2d 237 (1971). In the present case, we are only required to determine whether defendant owed a duty to plaintiff's decedent. The duty element questions whether an actor has a legal obligation "to so govern his actions as not to unreasonably endanger the person or property of others." *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967). As Prosser & Keeton wrote:

In other words, "duty" is a question of whether

---

seven feet from the power line. The exact distance the top of the ladder was from the line is, of course, unknown. However, defendant's expert testified that if a twenty-seven foot ladder moved six inches at the bottom, it would move 32.4 inches at the top. Nevertheless, this factual dispute was properly presented to the jury.

[3] 440 Mich 893 (1992).

the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. [Prosser & Keeton, Torts (5th ed), § 53, p 356.]

In determining whether a duty exists, courts examine a wide variety of factors, including the relationship of the parties and the foreseeability and nature of the risk. *Buczkowski v McKay,* 441 Mich 96, 100; 490 NW2d 330 (1992). Most importantly,[4] for a duty to arise there must exist a sufficient relationship between the plaintiff and the defendant. As this Court stated in *Samson v Saginaw Professional Bldg, Inc,* 393 Mich 393, 406; 224 NW2d 843 (1975):

> [T]o require the actor to act, some sort of relationship must exist between the actor and the other party which the law or society views as sufficiently strong to require more than mere observation of the events which unfold on the part of the defendant. It is the fact of existence of this relationship which the law usually refers to as a duty on the part of the actor.

Clearly, the relationship between the utility company and the decedent was sufficient to impose a duty under the circumstances. It is well established that those who undertake particular activities or enter into special relationships assume a distinctive duty to procure knowledge and experience regarding that activity, person, or thing.[5] For example, a landlord must inspect a premises to

---

[4] See *Buczkowski, supra,* for a more thorough discussion of the variables examined when determining whether defendant owed a duty to the plaintiff.

[5] See, generally, 3 Harper, James & Gray, Torts (2d ed), § 16.5, pp 397-415; *Levi v Southwest Louisiana Electric Membership Cooperative,* 542 So 2d 1081 (La, 1989).

keep it in a reasonably safe condition. *Samson, supra; Lipsitz v Schechter,* 377 Mich 685; 142 NW2d 1 (1966); 2 Restatement Torts, 2d, § 360, p 250. Physicians must keep reasonably abreast of current advances in their field. *Koch v Gorrilla,* 552 F2d 1170 (CA 6, 1977). Manufacturers must diligently inspect their products to discover lurking dangers. *Livesley v Continental Motors Corp,* 331 Mich 434; 49 NW2d 365 (1951); 2 Restatement Torts, 2d,. comment, § 395, pp 326-332. Lastly, a carrier owes to its passengers the duty of discovering all detectable defects. *Trent v Pontiac Transportation Co, Inc,* 281 Mich 586; 275 NW 501 (1937).

Similarly, compelling reasons mandate that a company that maintains and employs energized power lines must exercise reasonable care to reduce potential hazards as far as practicable. First, electrical energy possesses inherently dangerous properties. Second, electric utility companies possess expertise in dealing with electrical phenomena and delivering electricity. Lastly, although a reasonable person can be charged with the knowledge of certain fundamental facts and laws of nature that are part of the universal human experience, such as the dangerous properties of electricity, *Koehler v Detroit Edison Co,* 383 Mich 224, 231; 174 NW2d 827 (1970); Prosser & Keeton, *supra,* § 32, pp 182-184; 3 Harper, James & Gray, Torts (2d ed), § 16.5, pp 405-408, it is well settled that electricity possesses inherently dangerous properties requiring expertise in dealing with its phenomena. Therefore, pursuant to its duty, a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects.

Another important variable in determining

whether defendant owed a duty is foreseeability—
"whether it is foreseeable that the actor's conduct
may create a risk of harm to the victim . . . ."
*Moning v Alfono,* 400 Mich 425, 439; 254 NW2d
759 (1977). In *Samson, supra,* this Court further
explained the foreseeability element:

> Foreseeability . . . depends upon whether or
> not a reasonable man could anticipate that a given
> event might occur under certain conditions. But
> the mere fact that an event may be foreseeable
> does not impose a duty upon the defendant to take
> some kind of action accordingly. The event which
> he perceives might occur must pose some sort of
> risk of injury to another person or his property
> before the actor may be required to act. [*Id.* at
> 406.]

To paraphrase *Samson,* a reasonable person could
certainly anticipate that a painter could be electro-
cuted if his aluminum ladder came close to, or
touched, a pitted, corroded and frayed electric
wire.[6] Furthermore, a reasonable person could con-
fidently conclude that this event would cause seri-
ous injury or death to the painter.

Those engaged in transmitting electricity are
bound to anticipate ordinary use of the area sur-
rounding the lines and to appropriately safeguard
the attendant risks. The test to determine whether
a duty was owed is not whether the company
should have anticipated the particular act from
which the injury resulted, but whether it should
have foreseen the probability that injury might
result from any reasonable activity done on the
premises for business, work, or pleasure.[7] Here,

---

[6] Plaintiff's expert testified that because of the wire's age, it was
"pitted, corroded and broken."

[7] A plaintiff need not establish that the mechanism of injury was
foreseeable or anticipated in specific detail. It is only necessary that

Consumers Power should have realized that home-owners generally maintain their homes. This may include washing windows, cleaning troughs, repairing the roof, cleaning gutters, and, certainly, painting. Considering the proximity of the uninsulated primary wire to the house (roughly fifteen horizontal feet and twenty-four vertical feet from the ground), it was foreseeable that someone making repairs could be injured by a dilapidated wire. In fact, Consumers Power's alleged failure to conduct routine inspections of the wires, or conducting such inspections in a careless or deficient manner, made it reasonably foreseeable that the company's failure to discover or repair the damaged wires could result in injury or death to persons using an aluminum extension ladder in proximity to the wire.[8] Having found a sufficient relationship and a foreseeable risk of harm, it would be contrary to the rules and principles previously announced by this Court to hold that Consumers Power owed decedent no duty to properly inspect and maintain its wires so as to reasonably safeguard against injury or death.[9]

Where service wires erected and maintained by

the evidence establishes that some injury to the plaintiff was foreseeable or to be anticipated. See *Clumfoot v St Clair Tunnel Co,* 221 Mich 113; 190 NW 759 (1922); *LaPointe v Chevrette,* 264 Mich 482; 250 NW 272 (1933).

[8] Although we do not judge its reasonableness, in its answer to plaintiff's interrogatories, defendant stated that it inspected the wires in March 1983, four months before Mr. Schultz' fatal injury.

[9] Without expressly so holding, this Court has implicitly ruled that utility companies owe a general duty to the public to maintain equipment in a reasonably safe condition. Most recently, in *Laney v Consumers Power Co,* 418 Mich 180; 341 NW2d 106 (1983), we held that the applicable standard of care of a public utility that maintains electric power lines is "one of reasonable care measured by what a reasonably careful person or company engaged in maintaining electric power lines would do under the same circumstances." *Id.* at 186. In order to have addressed the appropriate standard of care, we first implicitly found that the utility company owed decedent a duty of care.

an electric utility company carry a powerful electric current, so that persons coming into contact with or proximity to them are likely to suffer serious injury or death, the company must exercise reasonable care to protect the public from danger. The degree of care required is that used by prudent persons in the industry, under like conditions and proportionate to the dangers involved, to guard against reasonably foreseeable or anticipated contingencies. *Laney v Consumers Power Co,* 418 Mich 180, 186; 341 NW2d 106 (1983). Electric companies must exercise ordinary care to guarantee that equipment is kept in a reasonably safe condition.[10] Although we do not follow a rule of absolute liability, the defendant's duties to inspect and repair involve more than merely remedying defective conditions actually brought to its attention.

Our conclusion that utility companies must reasonably inspect and repair their electric lines complies with the decisions of foreign jurisdictions.[11] *Miner v Long Island Lighting Co,* 40 NY2d 372; 353 NE2d 805 (1976), is representative of courts' treatment of the issue. There, the plaintiff, while preparing to trim an oak tree, inadvertently contacted a 7,620-volt uninsulated electric wire owned

[10] Long ago this Court held that utility companies owed the public "the duty of safeguarding by reasonable inspection and supervision its wire . . . and this duty was not met by a showing of suitable installation alone . . . ." *Mueller v Citizens Telephone Co,* 230 Mich 173, 177; 203 NW 129 (1925). The Court further explained that "[r]easonable supervision to maintain the integrity of the wire was required. The purpose of inspection is to discover need of repair and by repair prevent injury to persons and damage to property, and the duty is inclusive of wanton interference by human agency as well as wear and interference by the elements." *Id.* at 178. See also *Weissert v Escanaba,* 298 Mich 443; 299 NW 139 (1941).

[11] See, e.g., *Black v Public Service Electric & Gas Co,* 56 NJ 63; 265 A2d 129 (1970); *Aguirre v Los Angeles,* 46 Cal 2d 841; 299 P2d 862 (1956); *Vieths v Ripley,* 295 NW2d 659 (Minn, 1980); *Rich Mountain Electric Cooperative, Inc v Revels,* 311 Ark 1; 841 SW2d 151 (1992).

and maintained by the defendant. A jury rendered verdicts in favor of the plaintiff. The Appellate Division reversed the judgment, and dismissed the complaint on the ground that the plaintiff failed to establish a breach of duty. In holding that the power company had an affirmative duty to exercise reasonable care in the operation and maintenance of its power lines, the New York Court of Appeals reversed, emphasizing a number of factors. First, the court looked at the proximity and accessibility of the power lines to the public. The court noted that "where high-voltage lines were strung between closely spaced private residences, the risk to be foreseen was of the highest order; thus, the corresponding duty devolving upon the power company must be considered equally great." *Id.* at 379. Second, neither the condition nor the location of the wires had been inspected in over thirty years, "thereby leaving a lethal instrumentality in an area where it could, and of course did, cause enormous harm . . . ." *Id.* at 380. Accordingly, the New York Court of Appeals held that the Appellate Division erroneously dismissed the complaint.[12]

III

Defendant further claims that it was not negligent because the location of the power lines exceeded the clearance requirements published in National Electric Safety Code (NESC) Table 234-4, which requires a three-foot horizontal clearance

---

[12] Although the Court of Appeals may have erroneously consolidated independent elements of a negligence cause of action, it nonetheless held that a power company has an affirmative duty to reasonably operate and maintain its power lines. By discussing *Miner,* we do not intend to eradicate the distinct elements of negligence. See *Buczkowski, supra.*

between power lines and adjacent buildings.[13] It is uncontroverted that in the present case the placement of the wires exceeded the guidelines five-fold. Defendant argues that because the NESC guidelines delineate the appropriate standards for the design, maintenance, and operation of electric conductors, conformity with the standards proscribes negligence as a matter of law. While we agree with defendant that custom and industry practices are relevant to the issue of due care, they are not dispositive with respect to duty.

Compliance with the NESC or an industry-wide standard is not an absolute defense to a claim of negligence. While it may be evidence of due care, conformity with industry standards is not conclusive on the question of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances. *Owens v Allis-Chalmers Corp,* 414 Mich 413, 422-423; 326 NW2d 372 (1982); 2 Restatement Torts, 2d, § 295A, p 62. An argument on the basis of industry standards, therefore, goes to the question whether a defendant breached its duty of ordinary care, not whether a duty existed. If the plaintiff can convince a jury that a reasonably prudent company would have taken auxiliary measures beyond those required by industry standards, then the jury is clearly at liberty to find that the defendant breached its duty, regardless of the industry's guidelines. As the Supreme Court of Oklahoma has explained:

> "Although compliance with such safety requirement [sic] does not of itself establish that the defendant company was free from negligence inasmuch as such a regulation is a *minimum requirement* to conform with the dictates of reasonable

---

[13] See also Michigan Public Service Comm, Order No. 1679.

care, apart from unusual conditions the regulation stands as a reasonable guide in measuring due care."

\* \* \*

Assuming that this is the standard, it is a minimum standard only and plaintiff must have the opportunity to show non-compliance or that unusual circumstances do exist requiring [a higher standard of care.] [*Rotramel v Public Service Co,* 546 P2d 1015, 1017-1018 (Okla, 1975), partially quoting *Rudd v Public Service Co of Oklahoma,* 126 F Supp 722 (ND Okla, 1954).]

Second, by its express language, the NESC guidelines set only minimum safety standards. The introduction to the NESC provides:

The purpose of these rules is the practical safeguarding of persons during the installation, operation, or maintenance of electric supply and communication lines and their associated equipment. They contain *minimum* provisions considered necessary for the safety of employees and the public. They are not intended as a design specification or an instruction manual. [Emphasis added.][14]

Whether a company acted negligently, although it complied with industry standards or customs, is determined by the trier of fact under proper instructions by the court. Because it is not the province of this Court, we do not resolve the question whether defendant used reasonable care when it installed the wires roughly fifteen feet, six inches from the Osmond residence. The evidence

---

14 The MPSC similarly states:

The rules state the minimum requirements for spacings, clearances, and strength of construction. More ample spacings and clearances or greater strength of construction may be provided if other requirements are not neglected in so doing.

presented at trial supports the jury's conclusion that Consumers Power acted negligently in this case. We conclude, however, that a power company has a duty to reasonably install its power lines so as to safeguard the public from foreseeable injuries.

### IV

Accordingly, we reverse the Court of Appeals decision and find that Consumers Power has a duty to reasonably protect members of the general public from any foreseeable danger from its power lines. We reinstate the trial court's verdict and remand the case to the Court of Appeals to resolve the issues previously raised, but not addressed by this Court.

LEVIN, BRICKLEY, and BOYLE, JJ., concurred with MALLETT, J.

CAVANAGH, C.J. (*concurring*). I agree with the majority's duty analysis and its conclusion that the defendant owed a duty to the plaintiff to avoid negligent conduct in positioning and maintaining its power lines. I write separately, however, because, in my view, the primary cause of the plaintiff's injury in this case was not, as the majority suggests, the defendant's failure to detect and repair a frayed wire,[1] but, rather, the position-

---

[1] For instance, the majority states:

> [A] reasonable person could certainly anticipate that a painter could be electrocuted if his aluminum ladder came close to, or touched, *a pitted, corroded and frayed electric wire.* [*Ante,* p 452. Emphasis added.]

In my view, a painter *would* be just as electrocuted if his aluminum ladder came close to, or touched, *a perfectly maintained uninsulated wire carrying 4800 volts of electricity.*

ing of an uninsulated power line close to a preëxisting two-story wooden house.[2]

## I

In my view, the failure to maintain the wire had less to do with this accident than the position of the wire. Instead of focusing more on the defendant's duty to exercise reasonable care in *positioning* its uninsulated power line, the majority focuses primarily on the defendant's "duty to properly *inspect* and *maintain* its wires so as to reasonably safeguard against injury or death." *Ante,* p 453. (Emphasis added.) The danger created by the power company's failure to inspect and maintain the wire in this case is arcing. The evidence suggests that a frayed or "dilapidated wire" is capable of throwing an arc about one inch.[3] That is *not*

In addition, the majority states that, given the closeness of the wire and size of the house, "it was foreseeable that someone making repairs could be injured by a *dilapidated wire.*" *Ante,* p 453. (Emphasis added.) Again, I would submit that a person making repairs could be just as injured by a perfectly maintained uninsulated wire carrying 4800 volts of electricity.

Finally, the majority states:

> "Consumers Power's alleged failure to conduct routine inspections of the wires, or conducting such inspections in a careless or deficient manner, made it reasonably foreseeable that the company's failure to discover or repair the damaged wires could result in injury or death to persons using an aluminum extension ladder in proximity to the wire. [*Id.,* p 453.]

Although I am unsure about the intended meaning of this sentence, to the extent that it suggests that the *condition* of the uninsulated wire is all that made working in its proximity dangerous, I would disagree.

[2] The house was approximately twenty-seven feet tall at its peak.

[3] This is in ideal circumstances. The record shows that no one knows how far a power line can arc when the circumstances are less than ideal. Because no one knows how far an arc can be thrown in less than ideal circumstances, the Court of Appeals said that a claim based on being hit by an arc thrown further than one inch is outside

very far; indeed, it seems to me that the possibility of a one-inch arc would add little danger to that necessarily existing with a perfectly maintained *uninsulated* wire carrying 4800 volts of electricity. Therefore, in resolving this case, I would focus less on the *condition* of the wire and more on its *position.*

II

The two-story wooden house that the plaintiff was attempting to paint at the time of the fatal accident existed long before the defendant strung its power lines through the area. In positioning its lines, the defendant reasonably should have anticipated that someone might attempt the not unusual task of painting that home, *Hale v Duke Power Co,* 40 NC App 202, 204; 252 SE2d 265 (1979), and, given its height, that a person performing that task might use a ladder of sufficient length to permit the painting of its peak.

As a general rule, electric and telephone companies and others maintaining highly charged electric wires owe the legal duty, irrespective of any contractual relation, toward every person who in the exercise of a lawful occupation or pursuit in a place where he has a legal right to be, whether for business, pleasure, or convenience, may come in contact with the wires, to see that such wires are properly placed with reference to the safety of such persons and are properly insulated. The rule that persons controlling so dangerous[4] and subtle an agency as electricity should not be permitted to theorize in regard to its probable effects, or specu-

the realm of known scientific possibility, and that the defendant owed no duty to the plaintiff to guard against such a fortuitous occurrence.

[4] It has been stated that "[a]n uninsulated high voltage power line carrying a deadly current must be considered one of the most dangerous contrivances known to man." *Black v Public Service Electric & Gas Co,* 56 NJ 63, 72; 265 A2d 129 (1970).

late upon the chances of results affecting human life, is only in accord with reason and common sense. The wires must be either insulated or placed beyond the danger line of contact with persons going where they may reasonably be expected to go. [26 Am Jur 2d, § 122, pp 332-333.][5]

Given the facts of this case, reasonable minds could differ about whether the defendant was negligent in failing to insulate the wire or to position it at a height or distance[6] from the house so as to reduce or eliminate the risk of inadvertent contact by a ladder of sufficient length to permit its proper maintenance. Accordingly, I would agree with the majority that the Court of Appeals decision should be reversed and that this case should be remanded to that Court for consideration of the defendant's remaining issues.

LEVIN, J., concurred with CAVANAGH, C.J.

[5] See also 29 CJS, Electricity, § 38, pp 1057-1059 (stating that "[a] power company engaged in the transmission of electricity must anticipate and guard against events which may reasonably be expected to occur, and its failure to do so is negligence, even though the company could not have anticipated the injury which did occur").

[6] The defendant owns a sixty-foot easement that runs from the edge of the house in question to the middle of the North Chapin Road. The distance between the edge of the house and the edge of the road measured approximately fifty feet. As the appendix reveals, there is ample room within the easement to have located the wire further away from the house and closer to the road.

## APPENDIX

GRIFFIN, J. (*dissenting*). This action stems from the electrocution of plaintiff's decedent, Duane Schultz, who died while assisting a friend paint his house using an aluminum ladder near defendant Consumers Power Company's 4,800 volt transmission lines. At trial, plaintiff Alice Schultz, personal representative of the estate of Duane Schultz, alleged that defendant was negligent in three respects: (1) in failing to properly maintain and repair the power line, (2) in installing the primary wire at an unsafe distance from the residence, and (3) in failing to warn of the hazard of arcing and failing to provide effective insulation of the power line. The Court of Appeals concluded, as a matter of law, that defendant owed no duty to the plaintiff upon the basis of its finding that "the evidence establishes a fortuitous circumstance, not a contingency reasonably anticipated." Unpublished opinion per curiam, decided May 22, 1991 (Docket No. 118323). Because we are persuaded that the reasoning employed by the Court of Appeals is sound, we dissent from the majority opinion for reversal.

I

In general, the liability of power companies for damages for personal injuries to the public or to their patrons is governed by the rules of negligence. *Weissert v Escanaba*, 298 Mich 443, 452; 299 NW 139 (1941). It is axiomatic that there can be no actionable negligence where there is no legal duty. Duty is a question of "whether the defendant is under any obligation for the benefit of the particular plaintiff" and requires that the court review several variables[1] in determining whether

---

[1] In *Buczkowski v McKay,* 441 Mich 96, 101, n 4; 490 NW2d 330 (1992), this Court noted:

" 'the relation between individuals . . . imposes upon one a legal obligation for the benefit of the other.' " *Friedman v Dozorc,* 412 Mich 1, 22; 312 NW2d 585 (1981).[2]

The question whether a duty exists depends in part on foreseeability: whether it was foreseeable that a defendant's conduct may create a risk of harm to another person and whether the result of that conduct and intervening causes was foreseeable. *McMillan v State Hwy Comm,* 426 Mich 46, 61-62; 393 NW2d 332 (1986); *Buczkowski v McKay,* 441 Mich 96, 101; 490 NW2d 330 (1992).

Foreseeability has indeed been a determinative factor in ascertaining duty, or a lack thereof, in previous electrocution cases. Its role was explained by this Court in *Clumfoot v St Clair Tunnel Co,* 221 Mich 113, 116-117; 190 NW 759 (1922):

> In order that the plaintiff may recover it must appear that his injury was the natural and probable consequence of a negligent act or omission of

Dean Prosser described the several variables that consistently go to the heart of a court's determination of duty as including: foreseeability of the harm, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, policy of preventing future harm, and, finally, the burdens and consequences of imposing a duty and the resulting liability for breach. Prosser & Keeton [Torts (5th ed)], § 53, p 359, n 24.

[2] The question whether a duty exists is generally a question of law for the court. *Smith v Allendale Mutual Ins Co,* 410 Mich 685, 714; 303 NW2d 702 (1981). The *Smith* Court explained:

It is for the court to determine, as a matter of law, what characteristics must be present for a relationship to give rise to a duty the breach of which may result in tort liability. It is for the jury to determine whether the facts in evidence establish the elements of that relationship. Thus, the jury decides the question of duty only in the sense that it determines whether the proofs establish the elements of a relationship which the court has already concluded give rise to a duty as a matter of law. [*Id.* at 714-715.]

the defendant which under the circumstances an ordinarily prudent person ought reasonably to have foreseen or anticipated might possibly occur as a result of such act or omission.

. . . The test to be applied is, Was there a likelihood or reasonable probability of human contact with the wires by persons who had a right to be in a place from which such contact was possible? If so, the danger should have been foreseen or anticipated by the defendant.

In a number of instances since *Clumfoot* was decided, Michigan courts have recognized that power companies "are bound to anticipate only such combinations of circumstances and accidents and injuries therefrom as they may reasonably forecast as likely to happen . . . ." *Weissert, supra* at 453.

In *Dees v L F Largess Co,* 1 Mich App 421; 136 NW2d 715 (1965), the plaintiff sustained injuries when a crane he was working on came into contact with a power transmission line carrying 24,000 volts of electricity. Defendant Detroit Edison's alleged negligence was based on maintaining power transmission lines, elevated to a height of 37 feet at the poles and sagging to a height of 35 feet between the poles where the crane was operating, without dielectric covering. The trial court granted the defendant's motion for a directed verdict, and the Court of Appeals affirmed, stating:

It is clear that the Edison Company had a right to maintain transmission lines in the area of the construction, and it is also clear these wires were insulated within the meaning of the public service act. The high voltage wires were insulated by 35 feet of air space from any foreseeable contact. It therefore cannot be construed as negligence that the Edison Company did not also add a dielectric insulator in anticipation of construction in the

area. We would require additional facts to allow
the trial court to submit the question for a test as
to negligence to a trier of fact. *The law does not
require those maintaining power transmission
lines to anticipate every possible fortuitous circum-
stance that might cause injurious contacts with
those power lines.* [*Id.* at 427. Emphasis added.]

In *Gunn v Edison Sault Electric Co,* 24 Mich
App 43; 179 NW2d 680 (1970), a judgment of no
cause of action in a nonjury trial was affirmed by
the Court of Appeals. *Gunn* involved an action for
the death of a passenger in a seaplane who chose
not to use the regular approach pattern and col-
lided with the defendant's electrical wires. The
representative of his estate argued that the elec-
tric company was negligent in failing to have the
lines and poles marked either with paint or some
type of reflectors. Finding no clear error in the
trial court's ruling, the Court stated:

"[T]he law is complied with when an electric or
telephone company or others engaged in the trans-
mission or use of electricity provide such a protec-
tion as will safely guard against any contingency
that is reasonably to be anticipated. The extent of
the duty or standard of care is measured in the
terms of foreseeability of injury from the situation
created. There is no duty to safeguard against
occurrences that cannot be reasonably expected or
contemplated. A failure to anticipate and guard
against a happening which would not have arisen
but for exceptional or unusual circumstances is
not negligence, nor does the law require those
maintaining power transmission lines to anticipate
every possible fortuitous circumstance that might
cause injurious contacts with those lines." [*Id.* at
46-47, quoting from 26 Am Jur 2d, § 43, p 252.]

In *Carr v Detroit Edison Co,* 49 Mich App 332;
212 NW2d 70 (1973), the plaintiff's decedent was

electrocuted when the crane on which he was working contacted overhead power lines at a construction site. Citing *Dees,* the Court of Appeals affirmed a directed verdict in favor of the defendant:

> While Edison had engaged in a program to educate people in the construction industry regarding the dangers of working in close proximity to overhead wires, it is undisputed that Edison had no knowledge a crane was to be used at the construction site on the date in question. Since the contractor failed to inform Edison of the use of equipment in close proximity to the lines, no duty on the utility's part arose to inform the contractor or his employees of the hazard of working near overhead transmission lines, a hazard of which they were all admittedly well aware. [*Carr, supra,* p 340.]

Also, in *Ransford v Detroit Edison Co,* 124 Mich App 537; 335 NW2d 211 (1983), the plaintiff's decedent died as a result of electrocution when the wire-controlled model airplane he was flying became entangled with the control wires of another airplane and the wires of one of the planes came into contact with an electric transmission line. The plaintiff argued that Edison was negligent in failing to warn her husband of the danger involved in contact with uninsulated power lines, in failing to insulate the lines, and in stringing the lines only thirty-three feet above the ground. The trial court granted the defendant's motion for a directed verdict, and the Court of Appeals affirmed, stating:

> [T]he testimony in the instant case established that the power lines were installed 30 years prior to the accident, when the land was essentially open pasture and farmland. We hold, as a matter of law, that at the time of installation of the power

lines there was no "likelihood or reasonable probability of human contact" with them. *Clumfoot v St Clair Tunnel Co, supra,* p 117. In addition, plaintiff's proofs conclusively established that the view of the power lines was not obscured in any way. Her proofs were devoid of any evidence that Detroit Edison had notice of the wire-controlled model airplane demonstrations. In our judgment, this case involves a "fortuitous circumstance" not reasonably foreseen by Edison. See *Dees v L F Largess Co, supra,* p 427. Viewing the evidence in the light most favorable to plaintiff, we find that Detroit Edison breached no duty owed to plaintiff's decedent. [*Id.* at 546.]

The fortuitous circumstances that characterized these cases likewise prevail in the present situation. Throughout the many years since it was constructed in 1937, defendant has maintained the 4,800-volt overhead electric line in this same location. The lines were measured at 24 feet 4 inches (vertical distance) above the ground and 15 feet 6 inches (horizontal distance) away from the house owned by Mr. and Mrs. Osmond. The aluminum ladder involved in the accident was measured to be 27 feet in length. The Osmonds, who were friends of the decedent, both testified that they had moved to this address in 1977 and that they had never contacted defendant Consumers Power Company to complain about the transmission lines in front of the house. The record is devoid of testimony that anyone had ever called defendant concerning this line for any reason before this incident.

Plaintiff argued that defendant should have been aware that house painting was being undertaken because a Consumers Power Company employee was working on a pole near the house two days before the accident and should have noticed

that there were pump jacks set up next to the house in preparation for the painting. However, there was no testimony that any painting was ongoing on that particular day or that any aluminum ladders were on the Osmond property or in the front yard of the Osmond home when the employee was working on the pole. Defendant could not reasonably foresee or expect the contact with its power lines that occurred two days later.

The fortuity of the circumstances is reinforced by plaintiff's theory of the case. Mr. Osmond testified that, while he was balancing the ladder in a vertical position, Duane Schultz came to assist him and grabbed the ladder from the other side. At that instant, Osmond was aware of a bright flash. He testified that the top of the ladder had not contacted the primary wire before the flash. Plaintiff's expert theorized that the electrical current had arced the remaining distance from the primary wire to the ladder. But even the plaintiff's expert testified that, ordinarily, electricity from a 4,800-volt line cannot arc a distance greater than three-quarters of an inch. Plaintiff's expert had no information, based upon a reasonable scientific certainty, that the electricity could, under the circumstances of this case, arc further.

Assuming plaintiff's theory to be true, there was no scientific basis for concluding that the electricity jumped from the wires to the vertical ladder. Defendant had no actual knowledge that an aluminum ladder was being used in the vicinity of its power line and it certainly had no reason to anticipate that a 27-foot aluminum ladder would be placed, according to the more plausible theory, within inches of its 24-foot high overhead wires. We disagree with the majority's implicit assumption that this accident was reasonably foreseeable.

II

While the majority recognizes that "[t]he degree of care required is that used by prudent persons in the industry," it minimizes the significance of the safety standards utilized by the industry that were exceeded by the defendant three to five times. *Ante,* p 454. Such compliance with safety standards, although not necessarily determinative,[3] is a strong factor mitigating against the imposition of a duty. See *Dees, supra* at 427.

In *Buczkowski, supra* at 101, this Court noted that although foreseeability is often the first factor to be examined in determining the existence of a duty, "other considerations may be, and usually are, more important." Hence, the Court refused to impose a duty upon retailers of ammunition "to protect a member of the general public from the criminal act of a customer" even when the customer was intoxicated at the time of sale of the ammunition, *id.* at 103, in part because the Legislature "has enacted many statutes regulating the use of firearms . . . ." *Id.* at 106. In other words, the Court declined to impose a duty where the Legislature had refused to do so. *Id.* at 109.

Similarly, in the instant case, defendant not only met but exceeded by several factors the applicable governmental safety standards. Rule 1679 of the Rules and Regulations Governing the Construction, Maintenance, and Operation of Electrical Supply and Communication Lines, issued by the Michigan Public Service Commission, indicates that the acceptable horizontal clearance is three feet (for lines of 4,800 volts), or only one-fifth the actual distance Consumers Power Company installed this line away from the house (15 feet 6

---

[3] See *Owens v Allis-Chalmers Corp,* 414 Mich 413, 423; 326 NW2d 372 (1982); 2 Restatement Torts, 2d, § 288C, p 39.

inches). Thus, defendant installed its line at a distance from the house five times greater than the distance required by the code. Furthermore, in 1981 the National Electric Safety Code was modified with respect to the horizontal clearance requirements. That code requires that the distance should be five feet for electric lines constructed after that date, instead of three feet as provided by rule 1679. Thus, in accordance with the more recent national standard, the location of defendant's line is three times farther from this house than is required.

Rule 1679 states that 4,800-volt lines should be 20 feet above the ground (if over "[d]riveways to residence garages"), or as defendant's expert more precisely calculated (due to an adjustment) 21.29 feet. There is a driveway on the north side of the Osmond home, and thus that provision is applicable to this case. The 1981 version of the National Electric Safety Code also states that the vertical clearance should be 20 feet. The line in question, of course, was more than 24 feet above the ground. Even at "highway crossings," where one can reasonably foresee large vehicles and numerous activities, the state requires a height of only 22 feet, or two feet less than the height of defendant's line at this location. See MCL 460.554; MSA 22.154.

With respect to plaintiff's allegation that the electric lines were not properly insulated, it should be noted that defendant's electric line was more than 24 feet above the ground at the contact point; consequently, this case is governed by the rationale of those decisions that hold that the electric line was properly insulated as a matter of law. See *Dees, supra* at 427-428; *Williams v Detroit Edison Co,* 63 Mich App 559, 575-576; 234 NW2d 702 (1975).

The United States Court of Appeals for the Fifth

Circuit addressed the issue of regulatory compliance in connection with the element of foreseeability in *Mosby v Southwestern Electric Power Co,* 659 F2d 680 (CA 5, 1981). The decedent was electrocuted when a CB radio antenna being erected at a mobile home contacted the defendant's overhead electric line. In reversing a jury verdict and granting the defendant's motion for a judgment notwithstanding the verdict, the court stated:

> The litigants acknowledge that the key issue is foreseeability. In Texas the liability of an electric company for injuries resulting from contact with overhead power lines is based on the traditional concept of negligence requiring proof that the electric company could reasonably anticipate injury resulting from its conduct.
>
> * * *
>
> Plaintiffs have only shown that a fatal accident was within the range of possibilities. As [*Houston Lighting & Power Co v Brooks,* 161 Tex 32; 336 SW2d 603 (1960)] shows, foreseeability requires more. Note that we are not saying that compliance with the National Electrical Safety Code, standing alone, frees a power company from liability. As defendant correctly points out in its brief, code compliance is one of the many facts in this case negating a conclusion that SWEPCO should have anticipated contact with its line. Here there was undisputed evidence that the line was properly designed and met the code clearance requirements even after the mobile home was placed beneath it. The hazard of which the power company was shown to be aware was only the universal danger of contact with electric lines. [*Id.* at 681-683.]

The imposition of a duty upon the defendant under the present circumstances eviscerates the certainty and legislative judgment codified in the state and federal safety codes. To impose liability in the present situation, where the electric com-

pany has complied with all code requirements yet is nevertheless expected to guard against the unforeseeable use of an aluminum ladder with a length that exceeds the height of the wires, is equivalent to imposing strict liability.

### III

The imposition of a duty is particularly unwarranted in the instant case, given the decedent's awareness of the danger and the fact that sufficient room existed to perform the activity that caused the injury. This Court has previously held that a plaintiff's knowledge of the dangers presented by electrical wires, combined with a sufficient work area, were factors that relieved the utility of a duty to the plaintiff. In *Koehler v Detroit Edison Co,* 383 Mich 224, 227; 174 NW2d 827 (1970), the plaintiff, an ironworker, came into contact with power lines while he was riding on a cable that in turn was connected to a crane. The wires were 30 to 35 feet above ground level, and the plaintiff struck the wires as the crane swung the cable near the power lines. The trial court directed a verdict in favor of the defendant that was affirmed on appeal. The *Koehler* Court explained:

> With regard to negligence on the part of Detroit Edison, there is no testimony in this case from which a jury could find that the operation carried on with the crane was dangerous because of Detroit Edison's distribution line. The testimony is to the effect that there was sufficient room in which to work; that ironworkers fully understood the danger from electric wires and the importance of staying away from them; that there was no reason to expect trouble from the line or to alert Detroit Edison that a crane was to be used; that Koehler, Beard, Pankey, and others were aware of the

existence of the line and could have requested
Detroit Edison to insulate the line if they consid-
ered it necessary that such a step be taken; and
that Detroit Edison was not apprised of the opera-
tion or requested to take any precautions. The
mere fact that Detroit Edison knew a building was
under construction near its power line and that,
from time to time, mobile cranes were being
brought upon the premises to be used in construc-
tion work, would not, standing alone, create a duty
upon Detroit Edison to remove the charge, insu-
late the line, or notify the parties of a dangerous
condition. We agree with the finding of the trial
judge that there was no negligence on the part of
Detroit Edison. [*Id.* at 231. See also *Carr, supra.*]

The aluminum ladder used by the decedent had
two warning signs. The first read: "Danger, Watch
for wires, This ladder conducts electricity," and
the second warning indicated: "Caution: Electrical
shock hazard, Metal ladders should not be used
where contact may be made with electrical cir-
cuits."

The uncontroverted evidence demonstrated that
the electrical lines were clearly visible. Both Mr.
and Mrs. Osmond testified that they knew the
lines were there, that the lines were clearly visi-
ble, that they were in fact electric lines, that a
person could be killed or seriously injured if an
aluminum ladder contacted an overhead electric
line while they were touching the ladder, and that
they never warned the decedent about the hazard
because "[j]ust anyone with common sense knows
you just don't play around with power."

Mr. Osmond testified that "there was no plan-
ning before the work had begun" and that neither
he nor the decedent walked around to see if there
were any obstacles around the house before they
started painting. Both Mr. Osmond and the dece-
dent were aware of the electric lines. Mr. Osmond

explained that as he and the decedent were setting up the pump jacks in preparation for the painting project, the decedent stated, "Boy, those lines look awful close." Mr. Osmond testified that he never warned Mr. Schultz about the presence of the overhead electrical wires because, "I thought he would know basic—the same thing that I did, that you weren't supposed to touch electrical lines."

The danger involved in the instant case was an open and obvious one. Just as the danger of electricity is common knowledge, "so it is also common knowledge that any line or wire carrying electricity is dangerous." *Genaust v Illinois Power Co,* 62 Ill 2d 456, 469; 343 NE2d 465 (1976). Michigan case law recognizes the well-established rule that in product liability cases there is no duty to warn of dangers that are open and obvious. See *Glittenberg v Doughboy (On Rehearing),* 441 Mich 379, 393; 491 NW2d 208 (1992). Similarly, the *Koehler* Court recognized, in the present context, that awareness of the danger from electrical wires should, under certain circumstances, relieve the utility of the duty to warn of the dangerous condition. There is no compelling justification to abandon this well-reasoned precedent.

CONCLUSION

For the reasons set forth above, we would affirm the decision of the Court of Appeals.

RILEY, J., concurred with GRIFFIN, J.