*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RUSSELL MCKIE,

        Plaintiff-Appellant,

v

CONSUMERS ENERGY COMPANY,

        Defendant-Appellee.

UNPUBLISHED
September 1, 2022

No. 358845
Monroe Circuit Court
LC No. 20-143029-NI

Before: RIORDAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order granting summary disposition under MCR 2.116(C)(10) in favor of defendant, Consumers Energy Company (Consumers), and dismissing plaintiff's complaint. For the reasons set forth in this opinion, we vacate the trial court's order and remand for further proceedings.

## I. FACTUAL BACKGROUND

This matter arises from a June 6, 2017 incident in which plaintiff was electrocuted while power washing a home for a customer. Plaintiff was self-employed, performing painting and power-washing services. He had been in the business for more than 20 years. Plaintiff arrived at the customer's house between approximately 3:00 p.m. and 4:00 p.m. to begin power washing. The weather was "good," and it was light outside. Plaintiff saw the power lines in the back of the home before he began power washing the back of the house. According to plaintiff, there were wires running in the air at an angle toward one of the back corners of the house. The parties do not dispute that these power lines were located within a utility easement held by Consumers. He did not know how high the power lines were from the ground, but they "[l]ooked concerning." Plaintiff explained during his deposition that the closest electrical wire was "[d]efinitely . . . the closest thing I've ever seen to a house" and that "something wasn't right." But he believed "that the electrical company knew better" and that "[i]f they would put a pole that close to someone's house, that someone should be able to wash it, like I do everyone else's house."

Plaintiff began power washing the siding under the gutter at the top of the second story, near the back corner where the power lines came closest to the house as they ran at an angle. He

used a long spray wand with a metal nozzle. The wand was about 8 or 9 feet long, but it could extend up to about 12 or 13 feet. There was evidence in the record that it was extended to approximately 12 or 13 feet as plaintiff was power washing that day. He planned to switch to a shorter spray wand after he finished cleaning the upper portion of the house so he could avoid being close to the power lines as much as possible.

Plaintiff explained that while power washing the upper story, he "was keeping [the nozzle] probably 4 to 6 inches away from the house at all times, 'cause you got to deep clean, you're 4 to 6 inches away from the house." He estimated that his wand was simultaneously about 6 or 7 feet from the closest power line, which was behind him. Plaintiff testified, "I knew what was behind me and I definitely knew that there was a huge amount of power behind me, so I was so concerned of trying to keep myself with that wand in front of me." According to plaintiff, "[t]he water was shooting towards the wires because it was hitting—you know, I'm shooting on a 45-degree angle towards the house, it's hitting that gutter, which didn't have much of a soffit," and there was a "cloud of hot steam" because of the 260-degree water used in the power washer. He also testified that the "wires weren't wrapped."

Within a short time of beginning to power wash this portion of the house, plaintiff was electrocuted. Plaintiff maintained that his spray wand was still within 6 inches of the house and was still 6 or 7 feet from the power line when he received the electrical shock. Plaintiff stated, "I think the wire was getting wet and then it sent the shock over from the wire, to the gutter, down to me." He described the moment the shock occurred as follows:

> I seen it all happen, I was looking straight up there, so I watched the water molecules and the wire. The wire and the water molecules all came together as one and it just shot all the way to the house, and then down to me, and then it was just fire everywhere.

Plaintiff was eventually able to let go of the spray wand. His left foot was on fire, and a neighbor helped put it out. Plaintiff was taken to the hospital by ambulance. He returned to work within approximately a week.

## II. EXPERT OPINIONS

Plaintiff's forensic expert, Richard Buchanan, opined that the path of electricity had been from the power line, through the mist, through the spray wand, through plaintiff's body, and to the ground. He opined that the wand did not make direct contact with the power line because plaintiff would have been more severely injured, and the wand would have incurred more damage, had direct contact occurred. Buchanan also explained in his deposition that "the spray wand had a very small pinhole burn mark on it which, me, is evidence that there was an arc that initiated the current flow from the energized line to the wand." When asked if he could estimate the distance of the arc based on the pinhole, Buchanan responded:

> No, that's almost impossible to do, although, certainly, we know that it couldn't have been too far from the line, I'd say within six inches of the line itself, in order to be able to initiate that arc in the spray mist; and, obviously, there's a lot of variables that would contribute to determining what that distance had to be, but

my best guess is within six inches.

Buchanan thus concluded that the electrical current must have flowed through the mist of spray generated by the power washer to the tip of the wand. He also opined that there was no safe way to effectively power wash the siding without being in close proximity to the power line.

Defendant's expert, James Heyl, opined that the fine mist bouncing off the vinyl siding as plaintiff operated the power washer would not have been a sufficient conductor for a dangerous level of electrical current to flow to plaintiff's spray wand at any distance greater than 6 inches from the power line, and certainly not a distance of 9 feet from the power line, because of the air space within a fine mist of water resulting in high resistance to electrical current. However, he opined that if the wand came within 6 inches of the power line, or made direct contact with it, the wand and the water in the hose could have become energized. According to Heyl, an electrical arc could have formed through the air from the power line to the wand if the wand came within an inch of the power line. He also opined that such close contact was possible given the height of the power lines and the length of plaintiff's spray wand. Heyl further stated in his report:

> Work could have been performed with reduced clearance without contacting the power line.

> Proximity of the siding to the overhead power line and the length of the sprayer would require careful maneuvering to prevent dangerous contact between the sprayer and the power line.

> It would be possible (but certainly not recommended) for a determined worker to 'sneak' the sprayer tip upward within the 9-foot horizontal clearance to wash top of the wall while standing at the edge of the patio. While certainly encroaching into the MIOSHA-required l0-foot clearance zone, the spray wand would still have been several feet from the power line.

> However, the combined length of the extension pole, sprayer tip, and height held above the patio necessary to reach the siding at the top of the wall would place the spray tip at about l8 feet above the patio, at the same level as the power line. At this height, any movement that raised the sprayer to a vertical position would result in a close approach to, or contact, with the power line.

Both experts appeared to agree that the closest power line was approximately 18.5 feet vertically from the ground and approximately as close as 9 feet horizontally from the house.

## III. PROCEDURAL HISTORY

Plaintiff alleged in his complaint that defendant had breached its duty to safely maintain, position, inspect, repair, and insulate its power lines to protect people conducting reasonably foreseeable activity within the vicinity from injury. Consumers moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff's claim sounded in premises liability because it arose out of a condition on land, that the claim was barred because the condition was open and

obvious, and that plaintiff still could not establish a claim under ordinary negligence principles because defendant had no duty to warn of a known risk and plaintiff could not demonstrate proximate causation. Plaintiff opposed the motion.

Following a hearing on the motion, the trial court granted summary disposition in Consumers' favor. The court reasoned:

> I have to agree with Defendant's position in this case. I don't believe that there was a duty on the part of Consumers Energy here, to have to warn or anything else like that, or even to move these power lines when they are built in conformity with all regulations and standards. There, quite frankly, is no question in the Court's mind here too, that I do believe this is a premises liability issue. And even if I were to go that it was ordinary negligence, I accept the fact and what the case law cites. Utilities do not owe the duty, and especially when it is such an open and an obvious situation.

> This is unfortunate what happened to the Plaintiff, I agree. But as defense has pointed out, [plaintiff] has been involved in the trade for a substantial period of time. He knows the perils and the risk when you are operating in these areas.

> And, quite frankly, I think even on a comparative negligence aspect, there is probably 50 percent more negligence on his part here for the contact that was made. Whether I accept it was his actual wand that hit or it was arcing from the water mist, that is something that's completely foreseeable for somebody that is well versed in the trade and can see what is taking place.

## IV. STANDARD OF REVIEW

We review de novo the trial court's summary disposition ruling. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Summary disposition is proper under MCR 2.116(C)(10) when, after considering all evidence in the light most favorable to the party opposing the motion, the court determines there is no genuine issue of material fact. *Id*. at 160. " 'A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ.' " *Id*. (citation omitted). Whether defendant owed plaintiff a duty under the circumstances is a question of law that we review de novo. *Fultz v Union-Commerce Assoc*, 470 Mich 460, 463; 683 NW2d 587 (2004).

## V. ANALYSIS

We first address plaintiff's argument that the trial court erred by granting summary disposition based on concluding that defendant did not owe plaintiff a duty, which was influenced by the trial court's determination that plaintiff's claim sounded a premises liability. Plaintiff argues that the trial court's characterization of the nature of his claim was also erroneous. Consumers argues on appeal that the trial court was correct to rule that plaintiff's claim sounded in premises liability.

-4-

"In a premises liability action, a plaintiff must prove the elements of negligence: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the breach was the proximate cause of the plaintiff's injury, and (4) the plaintiff suffered damages." *Buhalis v Trinity Continuing Care Servs*, 296 Mich App 685, 693; 822 NW2d 254 (2012). "The threshold question in a negligence action is whether the defendant owed a duty to the plaintiff. It is axiomatic that there can be no tort liability unless defendants owed a duty to plaintiff." *Fultz*, 470 Mich at 463 (quotation marks and citation omitted). However,

> Michigan law distinguishes between claims arising from ordinary negligence and claims premised on a condition of the land. In the latter case, liability arises solely from the defendant's duty as an owner, possessor, or occupier of land. If the plaintiff's injury arose from an allegedly dangerous condition on the land, the action sounds in premises liability rather than ordinary negligence; this is true even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury. [*Buhalis*, 296 Mich App at 692 (citations omitted).]

Here, although plaintiff's complaint did not include a label for his claim, it "is well settled that the gravamen of an action is determined by reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of the claim." *Id*. at 691-692 (quotation marks and citation omitted).

Plaintiff's complaint alleged that "[w]hile power washing the home, mist from the home came in contact with the low-hanging power lines, which in turn caused electricity to flow through Plaintiff's spraying wand, resulting in Plaintiff becoming electrocuted." The complaint alleged that "energy companies have an affirmative duty to safely maintain and ensure that powerlines are positioned in a manner and location to protect those near the lines, and to inspect, repair, insulate and protect all persons conducting reasonably foreseeable activity from injury from the powerlines." Further, the complaint alleged that Consumers "breached this duty by failing to properly place their powerlines in a location that would ensure the safety of others conducting reasonably foreseeable activity and/or by negligently failing to move the powerlines upon express notice of the danger of their lines."

Consumers maintains that because the power line is a condition on land and is located within its easement, plaintiff's complaint sounded in premises liability. Consumers further argues that plaintiff's claim is thus barred because the power lines were open and obvious. Consumers cites *Morrow v Boldt*, 203 Mich App 324, 329-330; 512 NW2d 83 (1994), for the general rule that "it is the owner of an easement, rather than the owner of the servient estate, who has the duty to maintain the easement in a safe condition so as to prevent injuries to third parties."

However, in *Schultz v Consumers Power Co*, 443 Mich 445, 453-454; 506 NW2d 175 (1993), our Supreme Court specifically addressed the duty owed by an electric utility company to the public with respect to its high-voltage power lines, holding as follows:

> Where service wires erected and maintained by an electric utility company carry a powerful electric current, so that persons coming into contact with or proximity to them are likely to suffer serious injury or death, the company must exercise reasonable care to protect the public from danger. The degree of care

required is that used by prudent persons in the industry, under like conditions and proportionate to the dangers involved, to guard against reasonably foreseeable or anticipated contingencies. Electric companies must exercise ordinary care to guarantee that equipment is kept in a reasonably safe condition. Although we do not follow a rule of absolute liability, the defendant's duties to inspect and repair involve more than merely remedying defective conditions actually brought to its attention. [Citation omitted.]

In reaching this conclusion, the *Schultz* Court explained that "the duty element questions whether an actor has a legal obligation to so govern his actions as not to unreasonably endanger the person or property of others," *id*. at 449, and reasoned as follows:

In determining whether a duty exists, courts examine a wide variety of factors, including the relationship of the parties and the foreseeability and nature of the risk. Most importantly, for a duty to arise there must exist a sufficient relationship between the plaintiff and the defendant . . . .

[T]o require the actor to act, some sort of relationship must exist between the actor and the other party which the law or society views as sufficiently strong to require more than mere observation of the events which unfold on the part of the defendant. It is the fact of existence of this relationship which the law usually refers to as a duty on the part of the actor.

Clearly, the relationship between the utility company and the decedent was sufficient to impose a duty under the circumstances. It is well established that those *who undertake particular activities* or enter into special relationships assume a distinctive duty to procure knowledge and experience regarding that activity, person, or thing. For example, a landlord must inspect a premises to keep it in a reasonably safe condition. Physicians must keep reasonably abreast of current advances in their field. Manufacturers must diligently inspect their products to discover lurking dangers. Lastly, a carrier owes to its passengers the duty of discovering all detectable defects.

Similarly, compelling reasons mandate that a company that maintains and employs energized power lines must exercise reasonable care to reduce potential hazards as far as practicable. First, electrical energy possesses inherently dangerous properties. Second, electric utility companies possess expertise in dealing with electrical phenomena and delivering electricity. Lastly, although a reasonable person can be charged with the knowledge of certain fundamental facts and laws of nature that are part of the universal human experience, such as the dangerous properties of electricity, *it is well settled that electricity possesses inherently dangerous properties requiring expertise in dealing with its phenomena. Therefore, pursuant to its duty, a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects*. [*Id*. at 450-451 (citations and some quotation marks omitted; emphasis added).]

This approach to the duty of electrical utility companies has a long history:

> Long ago this Court held that utility companies owed the public "the duty of safeguarding by reasonable inspection and supervision of its wire . . . and this duty was not met by a showing of suitable installation alone . . . ." The Court further explained that "[r]easonable supervision to maintain the integrity of the wire was required. The purpose of inspection is to discover need of repair and by repair prevent injury to persons and damage to property, and the duty is inclusive of wanton interference by human agency as well as wear and interference by the elements." [*Id*. at 454 n 10 (citations omitted; ellipses and alteration in original.)]

In *Case v Consumers Power Co*, 463 Mich 1, 9; 615 NW2d 17 (2000), our Supreme Court explained that "the dangers of high-voltage electricity (fire, electrocution, and death among them)" justified the obligation to inspect and repair that was imposed on electric utility companies in *Schultz*. The Court further stated:

> The "duty" of inspection and repair imposed in *Schultz* was intended to protect against the likelihood of serious injury or death. Clearly, "reasonable care under the circumstances" represents a sliding scale. The more severe the potential injury, the more resources a reasonable person will expend to try and prevent that injury. Similarly, the greater the likelihood that a severe injury will result, the greater the lengths a reasonable person will go to prevent it. This principle is widely recognized. [*Id*. (citation omitted).]

Accordingly, our Supreme Court has made clear that an electrical utility company's duty with respect to overhead high-voltage power lines stems from the inherently dangerous properties of electricity, the potentially high severity of injury that electricity can cause, and the utility company's possession of the specialized knowledge and expertise in dealing with electrical phenomena. See *Schultz*, 443 Mich at 449-454, 454 n 10; *Case*, 463 Mich at 9. This duty is not imposed based on the mere possession of an easement in which to place the power lines, and this action thus does not sound in premises liability. See *Buhalis*, 296 Mich App at 692. The trial court therefore erred by concluding that this action sounded in premises liability and applying that framework to justify its decision to grant summary disposition in favor of Consumers.

Nonetheless, as the *Schultz* Court clarified, this duty does not impose "a rule of absolute liability." *Schultz*, 443 Mich at 454. The question of an electrical utility company's duty in a particular set of circumstances also involves consideration of "foreseeability," which

> depends upon whether or not a reasonable man could anticipate that a given event might occur under certain conditions. But the mere fact that an event may be foreseeable does not impose a duty upon the defendant to take some kind of action accordingly. The event which he perceives might occur must pose some sort of risk of injury to another person or his property before the actor may be required to act.

> Those engaged in transmitting electricity are bound to anticipate ordinary use of the area surrounding the lines and to appropriately safeguard the attendant

risks.  *The test to determine whether a duty was owed is not whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure.* [*Id.* at 451-452 (quotation marks and citation omitted; emphasis added).]

Here, the trial court failed to apply the above test.  Contrary to the trial court's ruling, "[c]ompliance with the [National Electric Safety Code (NESC)] or an industry-wide standard is not an absolute defense to a claim of negligence." *Schultz*, 443 Mich at 456.  The level of compliance with industry standards is more properly directed at the question of breach rather than duty.  *Id.*  "While it may be evidence of due care, conformity with industry standards is not conclusive on the question of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances." *Id.*

Because the trial court applied the incorrect legal framework in resolving defendant's motion for summary disposition, we vacate the trial court's order and remand for further proceedings consistent with this opinion.

Vacated and remanded.  We do not retain jurisdiction. Plaintiff having prevailed may tax costs.  MCR 7.219.

/s/ Michael J. Riordan
/s/ Stephen L. Borrello
/s/ Anica Letica