# Court of Appeals, State of Michigan

## ORDER

Estate of Catherine Dawn Skidmore v Consumers Energy Company

Docket No.    323757

LC No.        2012-001595 NH

Douglas B. Shapiro
Presiding Judge

Peter D. O'Connell

Stephen L. Borrello
Judges

The Court orders that the motions for reconsideration are GRANTED, and this Court's opinion issued January 19, 2016 is hereby VACATED. A new opinion is attached to this order.

O'Connell, J., would deny both motions for reconsideration.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

MAY 2 4 2016
_____
Date

_____
Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* Estate of CATHERINE DAWN SKIDMORE.

---

RALPH SKIDMORE, JR., Individually and as
Personal Representative for the Estate of
CATHERINE DAWN SKIDMORE,

       Plaintiff-Appellant,

v

CONSUMERS ENERGY COMPANY,

       Defendant-Appellee.

FOR PUBLICATION
May 24, 2016
9:25 a.m.

No. 323757
Calhoun Circuit Court
LC No. 2012-001595-NH

---

ON RECONSIDERATION

Before: SHAPIRO, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM

Defendant Consumers Energy Company is an electrical utility and transmits high-power electricity over elevated wires. Shortly after dark, on July 19, 2011, one of Consumers' high-voltage power lines fell to the ground in a residential neighborhood. Catherine Skidmore (Cathy) was electrocuted when she came into contact with the fallen line. Plaintiff Ralph Skidmore, individually and as personal representative of his wife's estate brought suit, alleging that the elevated power line fell due to a failure by Consumers to exercise reasonable care to maintain its lines and that Consumers' negligence was a proximate cause of his wife's death. Consumers filed a motion for summary disposition, asserting that it was not reasonably foreseeable that Cathy would run to the house where the downed power line had fallen and that it therefore owed her no duty. The trial court agreed and granted summary disposition. We reversed and remanded. Both plaintiff and defendant timely filed motions for reconsideration asserting that our opinion required clarification and we granted both motions. We again reverse and remand.

-1-

# I. FACTUAL BACKGROUND

Cathy was electrocuted as she ran onto the side yard of her across-the-street neighbor, Roddy Cooper, and came in contact with a high voltage wire that was on the ground. The incident occurred after dark.

Cooper's house sat on the corner of Shirley Avenue and Winnifred Street. Its front door and enclosed porch faced onto Shirley and it had a long side yard fronting on Winnifred with several windows. The Skidmores lived on Winnifred, directly across the street from Cooper's side yard. At the end of the long side yard, where the back yard began, there was a driveway on which Cooper's red van was parked.

## A. EYEWITNESSES TO THE INCIDENT

The lower court record contains portions of the deposition testimony of four eyewitnesses to the incident. Ralph Skidmore (Ralph), James Beam, and Don Stutzman viewed the events from outside Cooper's house, and Cooper viewed the events from inside his house. Each eyewitness testified that the evening of July 19, 2011 was warm and calm and that shortly after dark they heard a loud boom and the street lights in the area went out. Beam, Stutzman, and Ralph all observed sparks and light at the red van in Cooper's driveway. Concerned that the van might explode or set fire to Cooper's house, Beam, Stutzman, and Cathy each went to Cooper's house to warn him.

### 1. JAMES BEAM'S TESTIMONY

Beam testified that that after hearing the boom he stepped out onto his porch at which point "I seen (sic) the sparks on top of the van which was flashing light." Stutzman was next to him and together they ran to Cooper's house "to let them know that their van had sparks shooting off of it. It looked like it was going to catch on fire, maybe explode. It was just kind of a panicked instinct, I guess, to try to warn them to get away from it."[1] He and Stutzman banged on the front door and front window and yelled to Cooper that there was a fire. While he was at the front of Cooper's house, Beam saw Cathy run across Winnifred Street going from her house to Cooper's side yard. As she entered Cooper's side yard, Beam yelled "stop" but Cathy did not turn in his direction and he did not know if she heard him. He then heard a "loud pop" and "[s]he dropped to the ground and burst into flames." Cathy's husband, Ralph, came running over with a fire extinguisher, which Stutzman took from him and used to try to put out the flames.

On cross-examination by plaintiff's counsel, Beam was asked whether he had seen the power line in the grass before Cathy came into contact with it. He testified as follows:

---

[1] When asked what he and Stutzman planned to do next if Cooper did not come to the door he stated, "[t]here was no planning. There was no thought. It was just a reaction to an emergency."

*Q.*  Now you talked to counsel about Mrs. Skidmore coming in contact with the wire . . . and things of that nature.  Is it fair to say, Mr. Beam, that before she contacted the wire you didn't actually know it was even in the yard?

*A.*  Yes.

*Q.*  Was there any sparking that you saw at any point prior to the accident, sparking on the grass?

*A.*  No.

*Q.*  Anything that would suggest to you visibly that a power line was laying in the grass?

*A.*  No.

## 2.  DON STUTZMAN

Stutzman testified that he heard a loud pop and went outside with Beam to see what was going on.  He testified that he could see sparks in two places, at the transformer at the top of the utility pole at Shirley and Winnifred and by Cooper's van in the driveway on Winnifred.  Although he could not see the rest of the line, he concluded that it was somewhere along the side of Cooper's house.  When he saw Cathy "fast walk[ing]" into the side yard he yelled for her to stop, but could not tell if she heard him over the noise.  He testified:

*Q.*  Did it look like she heard you?

*A.*  Can't tell.

*Q.*  And so you saw Mrs. Skidmore come in contact with the wire?

*A.*  Not visually seen it, but she was there one minute and gone the next.

*Q.*  So you saw her walking across the yard and then just fall?

*A.*  Correct.

*Q.*  And you're assuming that's because she touched the wire?

*A.*  Yes.

Stutzman also testified that until Cathy went down and caught fire, there had been no fire in the yard and that the area had been dark.  When asked to further describe the visibility of the wire.  He stated that it was dark and that the line was "black-grey."  He stated that "you can barely pick out most of [the] lines.  So it's dark outside and you can't see anything, it's kinda hard to see a black line."  He explained:

*Q.*  Was there any sparking or lighting in the proximity of the line on the grass before that incident?

*A.* Not that I could see.

*Q.* Was there anything at all visually that would tell somebody running by there that there was a power line in the grass at that time.

*A.* No.

After Cathy fell to ground and caught fire, Ralph approached with a fire extinguisher. Stutzman took it from him, went to Cathy, and sprayed her with it.

### 3. RODDY COOPER

According to Cooper, the power line that broke runs above the southeastern corner of his house. Cooper heard a loud boom, followed by a brilliant flash and a buzzing sound. He looked out his back door and saw flames and a wire on the ground next to his van and he saw the wire sliding toward a bush. He realized a power line had come down, so he called 911. While he was speaking with the 911 operator he heard several people (apparently Beam and Stutzman) knocking at his front door. He heard various people yelling "Fire." He stood at his dining room window, which is about halfway along the side of the house. He could see across the street to the Skidmore house. He saw Cathy who lived across the street come out onto her side porch and call out, "Oh, my God, there's a fire. Ralph, Ralph." As he looked from the dining room window to the rear of the house (his left as he stood looking out the dining room window), he saw sparks and flames by the van. To his right, along the side yard there were no flames or sparks. Nor were there any by the kitchen windows that were between the dining room and the driveway.

Cooper was asked whether there was any reason that Cathy would have had trouble "seei[ing] a power line down when she ran across from her house to warn you at your house?" He answered that "it was dark out in the yard. I didn't even see the line. I couldn't see the line and I was right there." He stated that the line was sparking and arcing by the back door next to the van, "but out in the yard or wherever it came from, I couldn't see where it was going from there. . . . The only lights that I could see out there was street lights and window lights in the distance but everything in between was black. I mean I saw a silhouette. Even after Cathy was down, I saw a silhouette of people in the road and they were just dark shadow. They were dark shadows. It was dark out there."

### 4. RALPH SKIDMORE

Ralph testified that as he was getting into bed that evening at about 10:00 p.m. the lights flickered briefly. A few minutes later, Cathy, who was in the front room of the house where the window looked across the street, called out that the Cooper's van was on fire and that she was afraid it would explode. Ralph came to the front room and looked out the window with Cathy and saw that "the van was on fire. You could see it glowing and everything." They saw "sparks" and "bright flashes of light" on the side of the van facing toward the rear of the Cooper house. He heard sounds that "sounded like someone was welding." Ralph stated, "I thought the van was on fire. I'm not sure exactly what was making all the sparks and the smoke and everything . . . In my mind, there was something going on with the power lines." He agreed that he thought a power line had likely fallen.

According to Ralph, Cathy made no statements to him other than that she thought the van was on fire and that they needed to get Cooper out of his house. She said she thought the van might explode and she ran out of the house to warn him. Ralph followed her outside and saw her run towards Cooper's dining room windows inside of which he could see Cooper standing. He then saw her fall and catch fire.

Cathy died from her injuries.

## B. TESTIMONY CONCERNING DEFENDANT'S ALLEGED FAILURE TO SECURE AND MAINTAIN ITS ELEVATED POWER LINE

According to Ralph, the power lines in the neighborhood had been a problem for about 25 years, and the power would go out two or three times a summer. Stutzman and Beam also testified about frequent power outages and electrical problems. Ralph testified that following a windstorm in May 2011, Consumers worked on the lines but neighbors complained about the power lines being too tight, including the line that broke on the night of the accident. Beam testified that the line in question had been suspended from a short pole anchored to the remaining portion of the original pole that had broken during May storm.

Ralph testified that a power line had also fallen one year before the accident, and Cooper testified that the subject incident was the second consecutive summer that a high voltage line had fallen in his yard. Cooper testified that he told the workers that the trees needed to be trimmed and neighbors had complained about the trees causing arcing and sparking during wind and rain. James Leahy, a journeyman line worker, testified that if a tree touches a line and causes a repeated arc, the power line may fall. However, other deponents testified that there are many reasons why a power line could fall, including the activities of weather and animals.

Dr. Campbell Laird, one of the estate's experts, opined that Consumers lacked a "systematic inspection system" for the maintenance of vegetation surrounding power lines. Laird averred that a properly maintained power line should not fall absent some trauma to the line. Richard L. Buchanan, a public-utility expert, opined that Cathy's death was caused by poor vegetation management. Buchanan asserted that the 2010 incident with the power line should have alerted Consumers about the condition of the power lines in Cathy's neighborhood. Buchanan concluded that Consumers violated industry standards by failing to conduct preventative vegetation trimming.

## II. STANDARD OF REVIEW

This Court reviews de novo the trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When a party moves for summary disposition under MCR 2.116(C)(8) and (10), and the trial court considers documents outside the pleadings when deciding the motion, we review the trial court's decision under MCR 2.116(C)(10). *Hughes v Region VII Area Agency on Aging*, 277 Mich App 268, 273; 744 NW2d 10 (2007). A party is entitled to summary disposition under MCR 2.116(C)(10) if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id*. A genuine issue of material fact exists if, when viewing the record in the light most favorable to the nonmoving party, reasonable minds could differ on the issue.

*Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 116; 839 NW2d 223 (2013). Whether a defendant owed a plaintiff a duty is a question of law that this Court reviews de novo. *In re Certified Question From the Fourteenth Dist Court of Appeals of Texas*, 479 Mich 498, 504; 740 NW2d 206 (2007).

## III.  DUTY

To prove negligence, a plaintiff must show that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the plaintiff was injured, and (4) the defendant's breach caused the plaintiff's injury. *Henry v Dow Chemical Co*, 473 Mich 63, 71-72; 701 NW2d 684 (2005). "Every person engaged in the performance of an undertaking has a duty to use due care or to not unreasonably endanger the person or property of others." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). But if it is not foreseeable that the defendant's conduct could pose a risk of injury to a person with whom the defendant has a relationship, then there is no duty not to engage in that conduct. *Certified Question*, 479 Mich at 508.

The extent of duty that an electric utility company owes the public has been a topic of this state's jurisprudence for over a century. See *Huber v Twin City Gen Electric Co*, 168 Mich 531; 134 NW 980 (1912); *Laney v Consumers Power Company*, 418 Mich 180; 341 NW2d 106 (1983).

The issue was extensively explored in *Schultz v Consumers Power Co*, 443 Mich 445; 506 NW2d 175 (1993). In *Schultz*, the plaintiff's decedent was electrocuted while helping a friend paint his house. *Id*. at 447. The plaintiff's decedent was moving a 27-foot aluminum extension ladder and was electrocuted although the ladder never touched the elevated wires. *Id*. at 448. The plaintiff alleged that a fray in the wire, resulting from inadequate maintenance, allowed the electrical current to arc, i.e. jump through the air, to the nearby ladder. *Id*. at 448-449.

Our Supreme Court held that "a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Id*. at 451. This duty "involve[s] more than merely remedying defective conditions actually brought to its attention." *Id*. at 454.[2] It is not a leap to conclude that this duty includes an obligation to reasonably inspect for fraying lines as is alleged here, since a frayed line was responsible for the injury in *Schultz*.

---

[2] In *Case v Consumers Power*, 463 Mich 1, 7-8, 8 n 8; 615 NW2d 17, the Supreme Court clarified that a utility's general duty is always one of reasonable care, but that where the risk "involve[s] the dangers of unintended contact with high-voltage electricity," the "specific standard of care required to avoid breaching the general standard" includes "an obligation to reasonably inspect and repair wires." Where the danger is of a different magnitude, as in *Case*, where the danger was merely of "stray voltage" affecting the milk production of dairy cows, the Court held that only the general duty instruction should be given and it is for the jury to determine what precise actions are required to meet the duty of reasonable care. *Id*. at 9-11.

This duty does not, however, include guarding or warning against every possible contact with elevated power lines. In Chief Justice BRICKLEY's lead opinion resolving the consolidated cases in *Groncki v Detroit Edison Co*, 453 Mich 644; 557 NW2d 289 (1996), the Michigan Supreme Court rejected several claims involving incidents in which individuals accidentally came in direct contact with power lines that were elevated and that were not alleged to be defective or improperly maintained. *Id*. at 657, 660. The Court held that defendant could not have foreseen that equipment would come into contact with its reasonably maintained elevated powerlines. *Id*. Similarly, in *Valcaniant v Detroit Edison Co*, 470 Mich 82, 84-85; 679 NW2d 689 (2004), the Michigan Supreme Court rejected a case in which the plaintiff was shocked when the highest edge of a dump truck severed the overhead power lines. Again, the Court explicitly noted that there were no allegations that the lines were not properly inspected and maintained. *Id*. at 86.

Consumers contends that this case is on all fours with *Groncki* and *Valcaniant*. We disagree. Both cases are plainly distinguishable. First, in *Groncki* and *Valcaniant* the Court specifically noted that the defendant's duty to maintain the lines in reasonable condition was *not* at issue. By contrast, in this case the state of repair of Consumers' lines is directly at issue.[3] Second, the allegation in this case is not that Consumers should have foreseen accidental contact with an *elevated* power line; it is that Consumers should have foreseen accidental contact with a *power line that fell to the ground*. The risks of accidental contact with a live power line suspended in the air and accidental contact with a live power line on the ground are fundamentally different.[4]

Consumers argues that the unforeseeability of contact with a properly elevated power line necessitates a finding that contact with a power line that has fallen to the ground is also unforeseeable. However, this case bears no resemblance to the cases cited by defendant in which a person using a large ladder or piece of industrial equipment made contact with a properly maintained *elevated* power line well out of the reach of individuals passing by. Rather, it involves the question whether Consumers breached its duty to reasonably maintain its power lines and that as a result of that breach, a line fell to the ground, thereby creating a new and distinct potential for electrocution.

Moreover, it is reasonably foreseeable that persons in a residential area would act in response to the emergency to aid a neighbor. Indeed, both Beam and Stutzman also attempted to rescue Cooper. "[R]escuers, as a class, are foreseeable." *Solomon v Shuell*, 435 Mich 104, 135; 457 NW2d 669 (1990) (opinion by ARCHER, J).

---

[3] Plaintiff has not alleged that the lines should not have been placed where they were or that they should have placed at a higher elevation, only that they should have been maintained so as not to fall to the ground on a calm day.

[4] As stated by Chief Justice CARDOZO in an axiom familiar to any first-year law student: "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Palsgraf v Long Island R Co*, 248 NY 339, 344; 162 NE 99 (1928).

If the rescue attempt is itself is reasonable, then the rescuer is not deemed comparatively negligent merely for voluntarily exposing himself to an increased risk of harm in order to save another. The second step of the analysis is to determine whether the rescuer carried out the rescue attempt in a reasonable manner. If the rescuer did not, then the rescuer's recovery is reduced by his comparative degree of fault. [*Id*. at 136.][5]

While rescuers must act reasonably, whether they did so is a question of fact, not a question of law. *Id*. at 135-136.[6]

Defendant nevertheless argues that this case had to be dismissed because Cathy failed to take reasonable care to avoid its wire that had fallen in Cooper's yard. Even putting aside the rescue doctrine, we reject this argument on both factual and legal grounds.

We reject it factually because defendant may not simply wish away the many questions of fact that are present in this case. Whether Cathy even understood that a power line had fallen anywhere on Cooper's property is a question of fact. She presumably saw what her husband saw when looking out the window, which supports the view that she saw that a line was down. However, Ralph testified that the only statement his wife made was that the "neighbor's van is on fire" and Cooper testified that Cathy called out to him that there was a "fire." She made no statement about a downed power line to anyone. In addition, no one testified that they called out to her that a live power line had fallen. Second, even if she was aware that a line had fallen on the van, there is no evidence that she saw the power line in the yard, let alone in her path. The eyewitnesses all agreed that the only place the line could be seen was at Cooper's van, a significant distance from the dining room window that she was approaching. They unanimously testified that it was very dark, that there was no sparking or fire in the area where Cathy was walking, and that they had been unable to see the downed line in the grass where Cathy was electrocuted or even anywhere in the yard until the glow and fire of her electrocution lit the area.

We also reject the argument legally because Consumers is essentially claiming that this case should be treated as a premises liability case and that the fallen power line was an open and obvious hazard. However, the open and obvious doctrine has no applicability to this case. It is axiomatic that only a party that owns or controls the subject property may assert that its duty was

---

[5] Two other Justices concurred in Justice ARCHER'S opinion in full. Justice BOYLE wrote a separate concurrence signed by two other Justices in which she agreed that "the rescue doctrine provides that a rescuer is not deemed comparatively negligent merely for exposing himself to an increased risk of harm in order to save another so long as 1) it is not unreasonable to undertake the rescue, and 2) the rescue is carried out in a reasonable manner." *Id*. at 151 (concurring opinion by BOYLE, J.). The seventh Justice did not disagree, but concluded that the erroneous instruction was harmless. *Id*. at 153-154 (dissenting opinion by GRIFFIN, J.).

[6] That the reasonableness of a rescue is a question of fact holds true to the general principle that the fact that a plaintiff was also negligent does not alter the nature of the defendant's initial duty. See *Riddle v McLouth Steel Prods Corp*, 440 Mich 85, 98; 485 NW2d 676 (1992).

limited by the open and obvious doctrine. Had the estate sued the owner of the subject property, the owner could properly argue that his duty is limited to dangers that are not open and obvious and do not "give rise to a uniquely high likelihood of harm or severity of harm if the risk is not avoided." *Lugo v Ameritech Corp*, 464 Mich 512, 518-519; 629 NW2d 384 (2001). However, Consumers had neither ownership nor control of the property its power line fell onto and it may not assert the legal privileges of that owner. The mere fact that the injury occurred on a third-party's premises does not transform a case about proper maintenance of elevated high power lines into a premises liability case.

We reverse and remand for further proceedings consistent with this opinion.[7] We do not retain jurisdiction. As the prevailing party, the estate may tax costs. MCR 7.219.

/s/ Douglas B. Shapiro
/s/ Stephen L. Borrello

---

[7] To the extent that Consumers raises causation issues on appeal, Consumers did not raise these issues below. An appellee need not file a cross-appeal to argue alternative reasons to affirm, but the appellee must have presented the reasons to the trial court. *Riverview v Sibley Limestone*, 270 Mich App 627, 633 n 4; 716 NW2d 615 (2006). We decline to address these unpreserved issues because they do not concern issues of law, are not necessary to the resolution of the remaining issues, and our failure to rule on them will not work a manifest injustice. See *Heydon v MediaOne of Southeast Mich, Inc*, 275 Mich App 267, 278; 739 NW2d 373 (2007).